PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT
_____

No. 08-1748
_____

ROBERT M. HOWLEY,

Appellee,

v.

MELLON FINANCIAL CORPORATION; PLAN
ADMINISTRATORS OF THE MELLON FINANCIAL
CORPORATION DISPLACEMENT PROGRAM; MELLON
BANK 401K RETIREMENT SAVINGS PLAN; MELLON
FINANCIAL CORPORATION FLEXIBLE BENEFIT
PROGRAM; BENEFIT PLANS 1-10; JOHN DOES 1-10;
CORPORATIONS 1-10; AND MELLON FINANCIAL
CORPORATION DISPLACEMENT PROGRAM AND ITS
PLAN ADMINISTRATOR,

Appellants.

On Appeal from the United States District Court
for the District of New Jersey
No. 06-cv-5992
District Judge: Judge Faith H. Hochberg

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 29, 2009

Before: McKEE, *Chief Judge*, and CHAGARES and
NYGAARD, *Circuit Judges.*

(Opinion filed: August 31, 2010)

OPINION

Sherri A. Affrunti, Esq.
Reed, Smith
Princeton, NJ 08540

(James C. Martin, Esq.
(Daniel E. Wille, Esq.
Reed, Smith
Pittsburgh, PA 15219

Judith E. Posner, Esq.
Reed, Smith
Los Angeles, CA 90071

 *Attorney for Appellant*

(Kevin Barber, I, Esq.
(Peter J. Heck, Esq.
(Matthew J. Vance, Esq.
Niedweske, Barber
98 Washington Street
Morristown, NY 07962

2

*Attorney for Appellee*

McKEE, *Chief Judge*.

Defendants Mellon Financial Corporation ("MFC") and various MFC-related entities appeal the district court's order granting Howley summary judgment on his claim for benefits under MFC's Displacement Program. For the reasons that follow, we will affirm.

**I.**

Howley was employed for many years by a subsidiary of MFC known as "Buck Consultants." He was therefore eligible for, and participated in, MFC's Displacement Program. That program is a welfare benefit plan subject to the requirements and protections of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-461.

The Displacement Program provides benefits to an

3

employee of MFC or its subsidiaries whose "employment ceases due to technological change or another business reason not related to individual performance." J.A. 66. These benefits include severance pay, and perhaps more importantly, continued eligibility to participate in and receive benefits under other MFC benefit plans, including pension plans.

The Displacement Program states that it is "intended to help displaced employees 'bridge the gap' between periods of employment or retirement income." J.A. 73. An employee is therefore ineligible for Displacement Benefits if her/his employment with an MFC subsidiary is terminated due to MFC's sale of that subsidiary to a company that provides comparable employment. This so-called "sale of business" exception applies when:

> the employee's employment with [an MFC subsidiary] is affected by [MFC's] sale of a business . . . to another employer where the terms

4

of the sale, contract or transfer provide for employment of the employee by another employer and [MFC] determines (such determination being made in [MFC's] sole discretion) that the position to be provided to the affected employee:

-- Does not involve a significant change in responsibilities from those assigned to the employee immediately prior to the sale or transfer;

– Unless otherwise provided in the terms of the sale, contract or transfer, is at a location within a thirty (30) mile radius of the employee's location immediately prior to the sale or transfer; or[1]

– Initially provides base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided by the Participating [MFC] Company immediately prior to the sale or transfer.

J.A. 67.

Effective 11:59:59 p.m. on May 25, 2005, MFC sold Buck

to Affiliated Computer Systems, Inc. ("ACS"). The contract of

sale provided that ACS would continue the employment of

---

[1] Despite the use of the term "or" here, it is uncontested that these requirements are conjunctive rather than disjunctive.

5

approximately 3,700 Buck employees, including Howley, and that this employment would "initially:"

> (i) not involve a significant change in responsibilities from those assigned to the particular US Transferred Employee immediately prior to the transfer of such employment, (ii) offer employment at a location within a 30 mile radius from the principal work location of such US Transferred Employee immediately prior to the transfer of such employment, and (iii) provide base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to those provided to such US Transferred Employee immediately prior to the transfer.

J.A. 723. The next morning, May 26, 2005, at approximately 10:00 a.m., ACS informed Howley and ninety-nine other former Buck employees that it was terminating their employment effective June 2, 2005. J.A. 219.

Howley filed a claim for benefits under MFC's Displacement Program, but his claim was denied by the Program Manager who concluded that the aforementioned sale of business

6

exception applied. J.A. 141-55. She explained that the exception did not take into account the details of the job actually provided, but instead turned on the details of the job to be provided, as set forth in the contract of sale. She stated:

> the determination of whether the Sale of Business Exception has been satisfied in a particular instance must be made immediately prior to the Closing; sometimes referred to as a "snap shot" evaluation. That is, [the] Sale of Business Exception is satisfied if, immediately prior to the Closing, the Buyer has agreed to continue employment on the terms specified by the Exception.[2]

J.A. 153. Purportedly using this "snap shot" approach, the Program Manager concluded that the sale of business exception applied because Howley's "job duties, pay and location were

---

[2] The Program Manager also explained that the "snap shot" approach was reasonable because MFC needs to know on the closing date who is entitled to Displacement Benefits in order to "take the liabilities into account as part of the overall cost of the transaction, notify affected employees, remove the affected employees from the sale and continue them on [MFC's] payroll and benefits." J.A. 153-54.

7

unchanged immediately following the Closing." J.A. 154.

Howley appealed the Program Manager's decision to the Program Administrator, who affirmed the initial denial.[3] J.A. 36-51. Like the Program Manager, the Program Administrator stated that the details of the employment ACS actually provided to Howley were "not relevant for purposes of Displacement Program benefits." J.A. 48. She explained that the Program Manger had thus correctly applied the sale of business exception on a "snap shot" basis, evaluating only "the Buyer's representations in the sale agreement," and not taking into consideration the realities of that employment thereafter. J.A. 50. Because Howley's position at ACS "was for the same

---

[3] Under the terms of the plan, the Program Manager "is responsible for day-to-day administration of the Program, including . . . determining eligibility, amount and duration of all Program benefits." J.A. 66. An adverse decision by the Program Manager can be appealed to the Program Administrator, whose decision is final. J.A. 79.

responsibilities, was at the same base salary and incentive compensation level and within thirty (30) miles of the same location as his position at [MFC] immediately prior to the Closing Date of the sale," *Id.*, the Program Administrator agreed that the exception applied, and that Howley was ineligible for Displacement Benefits.

Howley brought suit in federal court, asserting claims for benefits and for unlawful discrimination under ERISA, as well as several related state law claims. During discovery, it came to light that certain Buck managers had helped plan his eventual termination by ACS prior to the sale. These managers provided ACS with the names of 100 employees, including Howley, whom they believed could be terminated immediately after the closing without causing harm to the business. Thus, these managers knew, prior to the sale's closing, that Howley would never be a bona fide employee of ACS. *See* J.A. 614.

9

Upon completing discovery, Howley moved for partial summary judgment on his claim for benefits, and Defendants cross-moved for summary judgment on all claims. The district court granted Howley's motion and denied Defendants' motion.[4]

The court explained at the outset of its analysis that because the plan language gave MFC discretion in interpreting its terms and making benefit decisions, the court was required to review its decision deferentially. However, the court also recognized that because MFC both sponsored and administrated the Displacement Program, it operated under a conflict of

---

[4] Because the district court granted Howley summary judgment on his claim for benefits, it dismissed all his other claims as moot. It noted, however, in response to Defendants' motion for summary judgment on Howley's discrimination claim, that it would have found a genuine issue of material fact as to whether MFC discriminated against Howley for the purpose of interfering with his rights under MFC's Displacement Program and Buck's Pension Plan. Defendants also challenge this portion of the district court's analysis on appeal. Because we agree with the district court that Howley is entitled to summary judgment on his benefits claim, we need not address the discrimination claim.

interest. Therefore, in accordance with then-controlling precedent, *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377, 392 (3d Cir. 2000), the court applied a "heightened arbitrary and capricious standard of review." J.A. 11.

In addressing the merits of Howley's claim for benefits, the court relied heavily on the evidence, revealed during discovery, that Buck had helped plan Howley's termination prior to the sale's closing. The district court accordingly reasoned that, even under the "snap shot" approach used by the Program Administrator, Howley had not received a bona fide offer of employment. Because "pre-planned immediate termination is not a job offer that satisfies the requirements of the [sale of business exception]," J.A. 14, the court held that MFC had abused its discretion in denying Howley's claim. This appeal followed.

**II.**

The district court had jurisdiction pursuant to 29 U.S.C. §

11

1132(e) and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the district court's grant of summary judgment, applying the same standard that the court should have applied. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002). Summary judgment is appropriate if, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Under 29 U.S.C. § 1132(a)(1)(B), a participant in an ERISA benefit plan denied benefits by the plan's administrator may sue in federal court "to recover benefits due to him under the terms of his plan." "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary

12

authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the administrator has discretionary authority, we review only for abuse of that discretion. "Of course, if a benefit plan gives discretion to an administrator . . . who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (quoting Restatement (Second) of Trusts § 187, Comment *d* (1959)).

An administrator's decision constitutes an abuse of discretion only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993).

## III.

Defendants challenge the district court's decision on two primary grounds. First, they argue that the district court erred by

13

applying a heightened standard of review. Based on the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), they contend that an administrator's conflict of interest does not result in heightened scrutiny of a decision to deny benefits. Rather, it is just one "factor" to be considered in evaluating whether that decision constituted an abuse of discretion. Second, Defendants argue that when reviewing an administrator's decision for abuse of discretion, a court may only consider the evidence that was before the administrator when it made the contested decision. Accordingly, they insist that the district court erred by considering the extra-record evidence that Buck managers helped plan Howley's termination prior to the sale to ACS. Although we agree that the district court "erred"[5] in both regards, it is

---

[5] The district court cannot fairly be said to have "erred" in applying a heightened standard of review. As we noted, when the

14

nonetheless clear, for reasons we set forth below, that MFC abused its discretion in denying Howley's claim for benefits.

**A.**

Defendants' first argument is plainly correct. As we recently discussed in *Estate of Schwing v. Lilly Health Plan*, prior to the Supreme Court's decision in *Glenn*, we had held that *Firestone* required courts to adopt a "sliding scale" standard of review, "in which the level of deference we accorded to a plan administrator would change depending on the conflict or conflicts of interest affecting plan administration." 562 F.3d 522, 525 (3d Cir. 2009). However, following *Glenn*, we acknowledged:

our "sliding scale" approach is no longer valid.

district court granted Howley's motion for summary judgment, our decision in *Pinto* was controlling precedent. Under *Pinto,* the district court was required to elevate its standard of review because of MFC's conflict of interest.

15

> Instead, courts reviewing the decisions of ERISA plan administrators . . . in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest *as one of several factors* in considering whether the administrator . . . abused its discretion.

*Id.* (emphasis added). Therefore, as Defendants argue, MFC's conflict of interest does not alter the standard of review for evaluating its decision to deny Howley benefits. Rather, that conflict is merely one factor to be considered in evaluating whether MFC's decision actually constituted an abuse of discretion.

**B.**

Defendants next argue that the district court erred by considering evidence outside of the administrative record. It is true that courts generally must base their review of an administrator's decision on the materials that were before the

16

administrator when it made the challenged decision. Materials that the parties failed to put before the administrator are not usually relevant to the inquiry of whether the administrator abused its discretion. Thus, under most circumstances, "the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation."[6] *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004).

However, this rule is not without exceptions. A court may certainly "consider evidence of potential biases and conflicts of interest that is not found in the administrator's record." *Id.*; *see also Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544

---

[6] We have described the deferential standard of review that we use in the ERISA context as both an "arbitrary and capricious" standard of review, and a review for "abuse of discretion." *See Estate of Schwing,* 562 F.3d at 526 n.2. We use these characterizations interchangeably in this opinion.

17

F.3d 1016, 1028 (9th Cir. 2008) ("[T]he district court may consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest.") (internal quotation marks omitted). The necessity for this exception is obvious. A plan participant may be unaware of information relating to an administrator's conflict until well after the administrative process has ended, and a conflicted administrator, especially one whose decision-making has been affected by that conflict, is not at all likely to volunteer that information. To allow an administrator the benefit of a conflict merely because it managed to successfully keep that conflict hidden during the administrative process would be absurd.

Although we adopted this exception prior to the Supreme Court's decision in *Glenn*, it remains equally appropriate after *Glenn*. *Glenn* directs a court to consider a conflict of interest as

18

a factor in its analysis, and to afford that factor greater importance, perhaps determinative importance, where the evidence suggests a greater likelihood that it affected the decision to deny benefits. 128 S.Ct. at 2351. For this legal standard to be meaningful, courts plainly must be willing to consider evidence relating to "the nature, extent, and effect on the decision-making process of any conflict of interest" revealed during the litigation process. *Burke*, 544 F.3d at 1028.

Here, the extra-record evidence considered by the district court was certainly relevant to assessing the extent of MFC's conflict of interest, and by inference, the effect of that conflict on its decision-making process. This evidence shows that while MFC was negotiating ACS's continued employment of Buck employees under terms that seemingly mirrored the requirements of the sale of business exception, its subsidiary was helping ACS plan the immediate termination of 100 of those employees. This

19

arrangement would have financially benefitted MFC in two ways. First, it allowed MFC to avoid paying Displacement Program benefits to 100 Buck employees by making it appear that their employment would continue uninterrupted at ACS. Second, it made the acquisition of Buck more appealing to ACS, because ACS knew that it could immediately slash costs by eliminating 100 of the employees it had agreed to employ. The existence of such a scheme – seemingly perfectly orchestrated to ensure that MFC would not have to pay, directly or indirectly, the cost of certain promised benefits – is surely evidence that a reasonable fact-finder could deem relevant to whether MFC's conflict of interest affected its decision to deny Howley's claim.

Nonetheless, the district court afforded more weight to this evidence than is appropriate when deciding a motion for summary judgment. *See Nolan v. Heald Coll.*, 551 F.3d 1148, 1155 (9th Cir. 2009) (holding that a court considering evidence

20

outside of the administrative record because of its relevance to a conflict of interest must still construe that evidence in favor of the non-moving party for the purposes of summary judgment). It is uncontested that Buck's managers colluded with ACS to plan Howley's termination in advance of the sale. However, it is not clear from the record why they did so, or at whose behest. Moreover, MFC has denied any knowledge of, or involvement in, its subsidiary's actions. Accordingly, there is a genuine issue of material fact regarding MFC's role in this duplicity. The district court erred in resolving this dispute in Howley's favor at this stage in the proceedings.[7]

Under these circumstances, we would normally remand so that the district court could evaluate Howley's claim in the first

---

[7] Howley does not argue that MFC is responsible for the actions of Buck's managers as a matter of law. He only claims that MFC was, in fact, the motivating force behind those actions.

21

instance using these correct legal standards. However, notwithstanding the district court's errors, we think it clear on this record that the denial of Howley's claim for benefits constituted an abuse of discretion. *See Fairview Twp. v. EPA*, 773 F.2d 517, 525 n.15 (3d Cir. 1985) ("It is well settled that we [can] affirm the district court on any basis which finds support in the record.") (internal quotation marks omitted). Accordingly, remand would only waste judicial resources and delay a decision on the merits.

## C.

In determining whether an administrator's interpretation of a plan is reasonable, we consider the following factors:

> (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue

22

consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Moench v. Robertson*, 62 F.3d 553, 566 (3d Cir. 1995). Construing all facts in Defendants favor, and thus affording negligible weight to MFC's conflict of interest, we conclude that its decision still fails by a majority of these measures, and was an abuse of its discretion.

As we have discussed, MFC's Displacement Program is designed to help "displaced employees 'bridge the gap' between periods of employment or retirement income." J.A. 73. When MFC sells a subsidiary, but ensures that the subsidiary's employees will be provided comparable employment by the buyer, there is no gap to bridge. Consequently, the Program does not pay those employees benefits. Consistent with this underlying purpose, the sale of business exception has two primary requirements: (1) the contract of sale must "provide for

23

employment of the employee by another employer," and (2) MFC must determine that the position "to be provided to the affected employee" is comparable to the position the employee held before the sale, and in particular, that it "[i]nitially provides base salary and incentive compensation opportunities which, in the aggregate, are reasonably similar to" those that were provided by the MFC subsidiary. J.A. 67.

For our purposes here, the crux of this language is the word "initially," as used to define when employment is sufficient to satisfy the sale of business exception. "Initially" is a less than precise word, but, at minimum, it connotes some temporal requirement. Therefore, consistent with this language, employment satisfies the sale of business exception only if it continues for some amount of time. Furthermore, that amount of time must be reasonable in light of the stated purpose of the Displacement Program. *See Keating v. Whitmore Mfg. Co.*, 186

24

F.3d 418, 422 (3d Cir. 1999) (an administrator's decision should not "controvert the . . . purpose of the Plan."). Again, the sale of business exception exists because employees provided comparable employment by a buyer have no gap in employment that they need to bridge. This is plainly not true, however, when the employment provided is de minimis.

Defendants spend the majority of their energy on appeal defending their use of the "snap shot" approach, through which they were able to ignore the fact that the employment provided to Howley by ACS was de minimis.[8] However, it is not that

_____

[8] Defendants argue that the plan language requires this prospective approach. As we have explained, the sale of business exception applies when the terms of the contract of sale "provide for employment of the employee by another employer," and MFC determines that the "position to be provided" offers initially comparable employment. J.A. 67. We agree that the "snap shot" approach *in and of itself* is reasonable given this language.

We note, however, that neither the Program Manager nor the Program Administrator stated in making their decisions that they used the "snap shot" approach because it was required by the plan language. Instead, they defended that choice as reasonable

approach in and of itself, but rather the Administrator's unreasonable wielding of it, with which we are concerned.

The Program Administrator explained that she evaluated the applicability of the sale of business exception based solely on "the Buyer's representations in the sale agreement." J.A. 50. She concluded that those representations satisfied the exception because, consistent with the exception's requirements, ACS agreed to "initially" provide comparable employment to Howley and the other Buck employees. However, the contract of sale included no definition of the term "initially," and imposed no other temporal requirement that ACS's employment of these persons need satisfy. Although ACS made other firm

because MFC needed to know its liabilities with finality prior to a sale's closing. The making of benefit decisions by an ERISA administrator based on what is best for the sponsor of the plan is a flagrant violation of that administrator's fiduciary duty to make such decisions "solely in the interest of the [plan's] participants and beneficiaries." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (quoting ERISA § 404(a)).

26

commitments in the contract of sale, promising to take certain

actions for specified periods of times, it did not do so with regard

to continuing the employment of Howley and the other

transferred employees.[9]

The Administrator concluded that ACS's entirely

---

[9] Notably, one of these commitments was ACS's agreement that it would provide severance pay equivalent to that which the employee would have received under the Displacement Program (which includes base salary but excludes incentive compensation, J.A. 69) to any transferred employee whom it failed to employ for three months following the sale. J.A. 725. However, ACS did *not* commit to continue providing any such employees with the other benefits that the Displacement Program deems equally important for providing a bridge between jobs. As we have noted, one such benefit is the ability to continue participation in pension plans. It is uncontested that Howley was eleven months from qualifying for early retirement under Buck's Pension Plan when he was transferred, and that had he been found eligible for Displacement Benefits, he would have been able to retire under that plan. J.A. 2.

Although these facts raise troubling inferences, we do not consider them for purposes of summary judgment review. Rather, we note only the uncontested facts that in the contract of sale, MFC failed to require ACS to commit to provide employment to transferred employees for a reasonable length (or *any* length) of time, or in the alternative, to provide *all* Displacement Program benefits to those employees in MFC's stead.

undefined commitment was sufficient to make applicable the sale of business exception. In so doing, she nullified the exception's temporal requirement, and thereby rendered the term "initially," as used in the plan language, meaningless. Under the administrator's approach, so long as a contract of sale includes a promise, no matter how illusory, to continue an employee's employment, that employee is ineligible for Displacement Program benefits. The buyer is thus free to terminate that employee one week, one day, or one hour (or even one minute) after completion of the sale. Crediting such empty promises is entirely unreasonable in light of the purpose of the Displacement Program. It leads directly to situations such as the one that arose here, permitting MFC to wash its hands of an employee on the date of sale, and the buyer to do so just a few days later.[10]

---

[10] Defendants emphasize that the contract of sale uses the word "initially" just as the Displacement Program does. This

28

Use of a "snap shot" approach does not relieve the Administrator of her duty to ascertain whether the temporal requirement of the sale of business exception is satisfied. Thus, the Administrator's review of the "buyer's representations" in the contract of sale must be more than a rubber stamp of hollow words, and must take into account the reality of what the buyer has actually committed to do. For a buyer's representations to satisfy the sale of business exception, the buyer must commit to continue the employment of transferred employees for some period of time that is reasonable in light of the plan's purpose (or, in the alternative, to provide *all* Displacement Program benefits

"copying and pasting" of plan language is insufficient. As we have explained, the contract of sale left that term undefined, and any reasonable interpretation of the Program must include a mechanism for giving that provision meaning. A retrospective evaluation of whether a buyer had "initially" provided comparable employment would certainly suffice. However, since Defendants insist that they cannot use a retrospective approach, the word must derive some meaning in the contract of sale itself, such as to not negate the provision and make its commitment illusory, as happened here.

29

in MFC's stead, if employment is not provided for a reasonable length of time).

Notably, the Administrator did at certain times appear to treat the sale of business exception as containing a temporal requirement. However, she concluded that this requirement was satisfied because ACS actually did provide Howley comparable employment "immediately after" the sale of Buck to ACS. J.A. 48; *see also* J.A. 154 (The Program Manager concluded that because Howley's "job duties, pay and location were unchanged *immediately following* the Closing, the conditions of the Sale of Business Exception were satisfied." (emphasis added)). This is, of course, inconsistent with the Administrator's emphatic insistence that she could only look to the buyer's representations in the contract of sale.

Additionally, though, this interpretation of what satisfies the temporal requirement is as unreasonable as her interpretation

30

nullifying that requirement. Given the purpose of the Program, "initially" must mean more than "immediately after" or "immediately following." Comparable employment "immediately following" displacement tells the Administrator nothing about whether that employee needs the "bridge" the Displacement Program is supposed to provide. If an employee is ineligible for benefits simply because s/he is momentarily employed after a sale, the Displacement Program offers employees a bridge to nowhere. This is flatly inconsistent with the stated purpose of the plan.

Defendants insist that since they voluntarily offer these benefits, they are free to structure the terms and requirements for receiving them as they see fit, and we agree. It is clear (and uncontested) that MFC had no obligation to offer these benefits. However, the keystone of ERISA's protections is that when employers choose to offer benefits (and reap the rewards of doing

31

so), they must administer those benefits in a manner that is reasonable. Administering benefits in a way that controverts a plan's stated purpose, renders plan language meaningless, and creates benefits that can exist only on paper, is unreasonable. In these circumstances, ERISA requires that we provide a remedy.

**IV.**

Because we agree that MFC abused its discretion in denying Howley's claim for benefits under its Displacement Program, we will affirm the district court's order granting Howley summary judgment on his claim pursuant to 29 U.S.C. § 1132(a)(1)(B).

32