NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4086
_____

A. J. ADAMS,
            Appellant

v.

COUNTY OF ERIE, PENNSYLVANIA; MARK DIVECCHIO, individually and in his
official capacity;
TONY A. LOGUE, individually and in his official capacities; DAVID AGRESTI,
individually and in his official capacity
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 1-07-cv-00316)
District Judge: Sean J. McLaughlin
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 23, 2014

Before:  FUENTES and FISHER, *Circuit Judges*, and STARK,[*] *District Judge*.

(Filed: February 18, 2014)
_____

OPINION OF THE COURT
_____

_____

[*]The Honorable Leonard P. Stark, District Judge for the United States District
Court for the District of Delaware, sitting by designation.

FISHER, *Circuit Judge*.

Appellant A.J. Adams filed suit in the United States District Court for the Western District of Pennsylvania against Mark DiVecchio, Tony Logue, David Agresti, and the County of Erie (collectively, "Appellees"), alleging that he was terminated from his position as First Assistant Public Defender for Erie County as political retaliation in violation of the First Amendment. He appeals the District Court's orders denying his pro se "Omnibus Motion for Relief" and granting Appellees' motion for summary judgment. We will affirm.

I

We write principally for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

Adams was hired as a full-time Assistant Public Defender in Erie County, Pennsylvania, in 1987. He became First Assistant Public Defender in 1989, and served in that capacity until his termination on January 13, 2006. At all relevant times, Adams was a registered Democrat. In 2005, DiVecchio, also a Democrat, was elected Erie County Executive. Logue had been a part-time Assistant Public Defender for twelve years and became Chief Public Defender under the DiVecchio administration. Agresti is a registered Republican and an attorney in Erie County who supported DiVecchio's campaign and later held a position in his administration.

2

In September and December 2005, Laurie Rogan, an investigator in the public defender's office and Treasurer for one of DiVecchio's fundraising committees, approached Adams and asked him to purchase tickets to fundraising events. Adams did so, writing a $50 check for admission to a breakfast event, and a $100 check for a ticket to DiVecchio's inaugural ball. He did not attend either event. He has asserted in this litigation that he made those contributions under duress – that he was "maced," which he defines as the practice of pressuring government employees to support a political campaign – but he concedes that he never objected to Rogan or to anyone else. He claims this was because he was nearing his twentieth anniversary as a county employee and did not want to risk the pension that would accompany such a milestone.

Following his victory in the general election, DiVecchio informed Logue of his intent to appoint him as Chief Public Defender for Erie County. Logue, in turn, intended to appoint Jim Pitonyak as his First Assistant, a move that would necessarily displace Adams. Logue and Pitonyak had worked together in the past and had a good working relationship. Logue has maintained, however, that he intended to keep Adams in the office, albeit at a lower position.

The record indicates that Logue did not seek advice from DiVecchio with respect to hiring decisions in the public defender's office, and that DiVecchio delegated to Logue responsibility to "put together a team that [Logue] thought would accomplish the goals that [Logue] had for the office." SA at 137. DiVecchio knew that Logue had Pitonyak in

3

mind for the First Assistant position, but was unaware that Adams held that job.  Logue claims to have spoken with Adams about his impending demotion in a hallway of the Erie County Courthouse sometime in December 2005, to which Adams responded with profanity and a declaration that he would never work for Logue, an outburst that Logue claims was the reason that Adams was fired.  Adams denies that the conversation ever took place.  On December 30, 2005, Adams received a letter signed by Logue and DiVecchio notifying him of his termination, effective January 13, 2006.

Before taking office, DiVecchio formed a transition team with Agresti.  The transition team was principally responsible for recommending individuals to fill the positions of County Solicitor, Personnel Director, and Finance Director.  Agresti was not involved, however, in staffing the public defender's office, and did not discuss positions in that office below the level of Chief Public Defender.  DiVecchio later appointed Agresti to the position of assistant solicitor for the Erie County Office of Children and Youth.

In an affidavit and subsequent deposition, Pennsylvania State Trooper Jim Brown claimed to have had a professional encounter with Agresti at some point in February or March 2006, during which he asked Agresti about the firing of Adams and another individual.  Agresti allegedly responded: "[T]hose guys should have known better.  You give $500.00 to each campaign and cover your bases."  SA at 48.

4

Adams filed suit in November 2007, and filed a fourth amended complaint on December 3, 2009. In the fourth amended complaint, Adams asserted a First Amendment political retaliation claim under 42 U.S.C. § 1983. Appellees moved for summary judgment, and the District Court heard argument on the motion on July 15, 2010.[1] In a thorough and well-reasoned opinion, the District Court granted summary judgment to Appellees on Adams's First Amendment retaliation claim. Shortly thereafter Adams filed a pro se "Omnibus Motion for Relief." Adams's counsel filed a motion to withdraw, which the District Court granted. The District Court then construed the

---

[1] In addition to his political retaliation claim, Adams brought a claim for deprivation of procedural due process as well as various state-law tort claims. At oral argument on Appellees' motion for summary judgment, Adams's then-attorney conceded that these claims could not survive summary judgment. These claims have not been preserved for appeal and, accordingly, are waived.

"Omnibus Motion" as a motion for relief from judgment, *see* Fed. R. Civ. P. 60(b), and denied it.[2]

## II

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's denial of Adams's Rule 60(b) motion for an abuse of discretion. *Ahmed*, 297 F.3d at 209. Our review of the District Court's order granting summary judgment is plenary, and we "apply[] the same standard that the court should have applied." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010) (citing *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002)). "Summary judgment is appropriate if, viewing the facts in the light most favorable to the

---

[2] Adams had also previously sought leave to amend his complaint to add a count under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), but the District Court denied the motion for leave to amend in a September 23, 2009 memorandum and order. Although Adams devotes much of his brief to the existence of a supposed-RICO conspiracy amongst the defendants to corruptly operate the Erie County government, he did not identify the District Court's September 23, 2009 order in his notice of appeal. *See* SA at 224. Rather, with respect to his RICO theory, he has appealed only the District Court's denial of his "Omnibus Motion," which the Court construed as a Rule 60(b) motion. "[A]n appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." *Browder v. Dir. Dep't of Corrs. of Ill.*, 434 U.S. 257, 263 n.7 (1978); *see also Smith v. Evans*, 853 F.2d 155, 158 n.1 (3d Cir. 1988). Thus, our review is constrained to whether the District Court abused its discretion in denying relief under Rule 60(b). *Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2003). The District Court determined that Adams had failed to produce newly discovered evidence that would justify proceeding to trial on his RICO theory. We conclude that this determination was not an abuse of discretion.

non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *see also* Fed. R. Civ. P. 56(c)(2).

III

Adams brought his political retaliation claim pursuant to 42 U.S.C. § 1983. For a claim under § 1983 to succeed, the plaintiff must prove (1) that the alleged injury was caused by a person acting under the color of state law; and (2) that the conduct deprived the plaintiff of a federally protected right. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc).

A public employee alleging discrimination on the basis of political affiliation must prove three elements: "'(1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a political affiliation, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision.'" *Smith v. City of Allentown*, 589 F.3d 684, 692 (3d Cir. 2009) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 243 (3d Cir. 2006)). Upon such a showing, the burden then shifts to the defendant to show "'by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.'" *Id.* at 692-93 (quoting *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007)).

The District Court assumed without deciding that Adams had satisfied the first two criteria – that he held a non-policymaking position, and that he had a protected political

7

affiliation – but determined that he had failed to produce evidence showing a genuine dispute of material fact on the issue of causation. Adams challenges this conclusion.[3] He asserts what he calls a "pay-to-play" theory: that those individuals who gave $500 or more to the DiVecchio campaign kept their jobs or were appointed to positions within the administration, and individuals such as he who contributed less or nothing at all were terminated or not hired. The District Court carefully considered the record evidence with respect to each defendant. We agree with its thoughtful analysis, noting only a few particularly relevant points.

With respect to Agresti, the District Court determined that he could not be held liable under § 1983 because at the time Adams was terminated, Agresti was not a state actor. We agree. Though he was working with the DiVecchio transition team, Agresti was not a public official; rather, he was in private practice with his family's law firm. While it is true that private individuals can act under color of state law for purposes of § 1983 when they "'corruptly conspire'" with a state actor, *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (quoting *Dennis v. Sparks*, 449 U.S. 24, 29 (1980)), there was no evidence of such a conspiracy here. Rather, the evidence showed that the decision to place Pitonyak in the First Assistant

---

[3] Appellees, while agreeing with the District Court's ruling with respect to causation, argue in addition that Adams held a policymaking position. Because we agree with the District Court's causation analysis, we see no need to address whether the First Assistant Public Defender position is one for which political affiliation is a relevant consideration.

position was made by Logue and approved by DiVecchio with no involvement by Agresti. Nor does Agresti's alleged statement to Trooper Brown suffice to establish a material factual dispute that he had conspired with state officials in such a way as to make him liable under § 1983. Agresti did not credit the statements to DiVecchio, Logue, or any other state actor, nor did he suggest that he was involved in the hiring process for the public defender's office, let alone that he conspired with others to impose a threshold donation amount that public employees must meet to retain their positions. Accordingly, the District Court did not err in granting summary judgment to Agresti.

While DiVecchio, on the other hand, clearly was a state actor for purposes of § 1983, the evidence failed to create a genuine factual dispute that he had knowledge of Adams's protected political activity (i.e., choosing to donate less than $500) and that this knowledge motivated him to terminate Adams. As the District Court noted, the uncontradicted evidence showed that DiVecchio delegated hiring in the public defender's office to Logue. Although he was aware that Logue intended to hire Pitonyak, DiVecchio was unaware that Adams was the First Assistant. But more to the point is the fact that Pitonyak's donations do not fit Adams's putative pay-to-play scheme. While Pitonyak cumulatively gave DiVecchio's campaign about $1,000 from 2005 to 2009, for Adams's theory to hold up Pitonyak would have to have given $500 or more before his appointment (or perhaps shortly thereafter). To the contrary, Pitonyak gave $100 in September 2005 and $250 in December 2005. His combined $350 donation prior to

9

being appointed to the First Deputy position thus places him in the same class of protected political activity as Adams. One cannot reasonably infer from this fact that Adams was fired based on the amount that he donated. Summary judgment for DiVecchio was thus appropriate.

With respect to Logue, the evidence was uncontroverted that Logue did not know about Adams's non-support of DiVecchio, which Adams conceded he kept to himself. Indeed, Adams's name appeared on a fundraising flier for the DiVecchio campaign, and Adams had twice donated money to support the campaign. Adams produced no evidence that Logue was motivated by the level of Adams's support. Moreover, Logue had a longstanding professional relationship with Pitonyak and had made it clear that, if he were appointed Chief Public Defender, he wanted Pitonyak as his First Assistant. The District Court thus did not err in granting summary judgment to Logue.[4]

Finally, we note that while the County of Erie remains a party to this case and was named as a defendant in the political retaliation count, we find no argument in Adams's briefs suggesting that the County is liable under § 1983 based on "'a policy statement,

---

[4] We also note that the District Court did not abuse its discretion in denying Adams's "Omnibus Motion," construed as a motion under Rule 60(b), as it related to its grant of summary judgment. Relief under Rule 60(b) is an "extraordinary" remedy justified only by "special circumstances." *Moolenaar v. Gov't of the Virgin Islands*, 822 F.2d 1342, 1346 (3d Cir. 1987) (quoting *Page v. Schweiker*, 786 F.2d 150, 158 (3d Cir. 1986) (internal quotation marks omitted)). The District Court's finding that Adams had failed to show the type of extraordinary circumstances justifying relief, such as the discovery of evidence not previously available, was well within its discretion.

10

ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978)). We consider waived any challenge to the District Court's grant of summary judgment to the County on that issue.

## IV.

We find no error in the District Court's careful analysis, and accordingly we will affirm.