PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3855
_____

LEO NOGA

v.

FULTON FINANCIAL CORPORATION EMPLOYEE
BENEFIT PLAN;
RELIANCE STANDARD LIFE INSURANCE COMPANY

Reliance Standard Life Insurance Company,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 5-18-cv-03455)
District Judge:  Honorable Jeffrey L. Schmehl
_____

Argued:  January 12, 2021

Before:  AMBRO, KRAUSE, and PHIPPS, *Circuit Judges*

(Filed:  November 26, 2021)
_____

Joshua Bachrach     [ARGUED]
Wilson Elser Moskowitz Edelman & Dicker
2001 Market Street
Two Commerce Square, Suite 3100
Philadelphia, PA 19103

*Counsel for Appellant*

Tybe A. Brett        [ARGUED]
Feinstein Doyle Payne & Kravec
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

PHIPPS, *Circuit Judge*.

In this suit under the Employee Retirement Income Security Act, *see* 29 U.S.C. § 1132(a)(1)(B), a plan participant claims that an insurance-company fiduciary wrongfully terminated his benefits. The participant enrolled in his former employer's welfare benefit plan, which provided long-term disability and life insurance benefits through group insurance policies. When his health deteriorated to the point that he could no longer do his job, the participant claimed benefits under both policies.

2

The insurance company, which funded and administered those policies, initially determined that the participant was totally disabled and authorized benefits under both policies. Its in-house medical professionals reaffirmed that conclusion for about two years. But then, with no recent change to the participant's medical condition, the insurance company used a third-party vendor to select and retain an outside physician to evaluate the participant. After an in-person examination, that physician concluded that the participant was not totally disabled, and on that basis, the insurance company terminated benefits under both policies.

The participant administratively appealed, and the cycle repeated. The insurance company's in-house medical professionals once again found the participant to be totally disabled, and the insurance company reinstated benefits. But it then used the same third-party vendor to arrange for a reevaluation of that assessment. This time, two outside medical professionals performed paper reviews of the file. Both made findings against total disability. Citing those reports along with the prior report from the other outside physician retained by the third-party vendor, the insurance company terminated the participant's benefits – again.

Those multiple requests for additional outside medical reviews were irregular in their timing and prompting. To explain the requests made on administrative appeal – which were also irregular in their scope – the insurance company submitted an affidavit from one of its analysts. But in evaluating the parties' cross-motions for summary judgment, the District Court did not consider that affidavit. Instead, it analyzed the participant's claim based on the administrative record, which the insurance company had filed. On that record,

3

the District Court concluded that the termination of benefits was arbitrary and capricious, and it ordered their retroactive reinstatement.

In reviewing that order *de novo*, *see Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011), we will affirm. A combination of structural and procedural factors compels that conclusion. The insurance company performed two functions that are in financial tension with each other: it determined eligibility for benefits, and it funded benefits. That creates a structural conflict of interest, which, by itself, is not a breach of fiduciary duty. But here, based on only the administrative record – not the proffered supplemental affidavit, which was properly excluded – the insurance company also deviated significantly from its normal eligibility-review processes, primarily through its anomalous requests for outside reevaluation of the participant. Those procedural irregularities aligned closely with the insurance company's structural conflict of interest, so much so that the financial incentives at the core of the insurance company's structural conflict influenced its fiduciary decision-making. For these reasons, as elaborated below, the insurance company abused its discretion in terminating the participant's benefits, and the District Court properly ordered their retroactive reinstatement.

I.  BACKGROUND

A.  *Leo Noga and the Insurance Policies Administered and Funded by Reliance Standard.*

Leo Noga began working as a financial advisor for Fulton Financial Corporation in 2009. As an employee, he elected to

4

participate in the long-term disability and life insurance benefits that Fulton Financial offered through group insurance policies with Reliance Standard Life Insurance Company. *See generally* 29 U.S.C. § 1002(7) (defining "participant" to include employees or former employees who are eligible to receive a benefit of any type from the employer's employee benefit plan). Those policies qualify as benefit plans subject to ERISA. *See generally id.* §§ 1002(1) (defining "employee welfare benefit plan"), 1003(a) (subjecting employee benefit plans to ERISA).

Both policies grant discretionary authority to Reliance Standard to determine eligibility for benefits. *See* Reliance Standard Long Term Disability Policy at 6.0 (App. 92) ("Reliance Standard Life Insurance Company . . . has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits."); Reliance Standard Life Insurance Policy at 11.0 (App. 1756) (same); *see also Luby v. Teamsters Health, Welfare, & Pension Tr. Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991) ("Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan."). Due to that discretionary authority, Reliance Standard is a fiduciary with respect to those plans. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (explaining that a benefit determination is a fiduciary act); *see also* 29 U.S.C. § 1002(21) (identifying persons who qualify as ERISA fiduciaries). But Reliance Standard also funded the long-term disability and life insurance policies and paid for benefits under those policies.

5

*B. Noga's Benefit Claims and Reliance Standard's Initial Approval of Those Claims.*

In 2014, after working over five years for Fulton Financial, Noga began experiencing pain and numbness in his feet and legs. His symptoms progressed over the next several months, and he started having difficulty standing, walking, and driving. By early 2015, he could no longer work as a financial advisor for Fulton Financial. After appointments with various specialists, Noga was eventually diagnosed with neurogenic muscular atrophy and diabetic polyneuropathy.

At that point, Noga applied for benefits under the long-term disability insurance policy with Reliance Standard. That policy provides benefits for employees who are "Totally Disabled," defined as those who "cannot perform the material duties of his/her Regular Occupation." Reliance Standard Long Term Disability Policy at 2.1, 9.0 (App. 88, 96). In support of his claim, Noga submitted records from numerous treating physicians, including his primary care physician, a physiatrist, two neurologists, a neurosurgeon, a rheumatologist, and an orthopedic surgeon.

Reliance Standard assigned an in-house registered nurse to review Noga's medical records. That nurse certified that Noga was "precluded from stand[ing] and walk[ing] on greater than an occasional basis" and that he "lack[ed] consistent work function." Reliance Standard Claim Notes (July 23, 2015) (App. 201). And, in August 2015, Reliance Standard approved Noga's claim for long-term disability benefits, finding that he was totally disabled under the policy.

6

With that favorable disability-benefits determination, Noga then sought an extension of his life insurance and a waiver of his premiums through a complementary provision in Fulton Financial's group life insurance policy with Reliance Standard. That provision required Reliance Standard to extend an employee's life insurance and waive any premiums owed "during a period of Total Disability." Reliance Standard Life Insurance Policy at 9.0 (App. 1754).

Following a separate review process, Reliance Standard approved Noga's life insurance claim in January 2016.

### C. Reliance Standard's Periodic Reevaluation of Noga's Disability Between October 2015 and September 2017.

Over the next two years, Reliance Standard periodically reviewed Noga's updated medical records to assess his ongoing eligibility for long-term disability and life insurance benefits. Noga's physicians continually reaffirmed his diagnoses of neurogenic muscular atrophy and diabetic polyneuropathy – conditions that his endocrinologist described as "permanent" and "irreversible." Letter from Endocrinologist to Primary Care Physician (Aug. 11, 2016) (App. 903). But beginning in mid-2016 and continuing into 2017, Noga indicated during appointments with his primary care physician and his physiatrist that his legs were improving and feeling stronger, that he could walk up to one mile in the pool each day, and that he no longer needed leg braces while walking, though he still sometimes used a cane. During that same period, however, Noga also reported that he continued to feel pain and numbness in his feet and legs, struggled to walk and balance, and suffered from chronic fatigue.

7

As it received updated medical records, Reliance Standard assigned its own registered nurses to review them. Four different nurses – on six separate occasions between October 2015 and September 2017 – recertified Noga's eligibility for benefits.

> D. *Reliance Standard's October 2017 Decision to Conduct an Independent Medical Examination and Its Later Termination of Noga's Benefits.*

In October 2017 – despite having recertified Noga's benefits less than a month prior – Reliance Standard requested that Noga undergo an independent medical examination, which is commonly referred to as an 'IME.' Reliance Standard used a third-party vendor to select a doctor who was not Noga's treating physician or one of its in-house medical professionals. The chosen doctor, a physiatrist, examined Noga in November, and determined that the numbness and pain that Noga experienced were consistent with a diagnosis of diabetic polyneuropathy and that the impairment was "permanent in nature." Physiatrist IME Report at 8 (Nov. 28, 2017) (App. 1268). Still, the physiatrist found that Noga "demonstrated a high degree of symptom exaggeration or inappropriate pain behavior" and that he "was able to move about the room freely without any significant difficulty." *Id.* at 5, 7 (App. 1265, 1267). The physiatrist's conclusion was that Noga was "capable of gainful employment." *Id.* at 8 (App. 1268).

Reliance Standard adopted that conclusion. After reviewing the IME report, it determined that Noga was no longer totally disabled from performing his regular occupation.

8

Reliance Standard then terminated Noga's benefits under both the long-term disability and the life insurance policies in December 2017.

### E. Noga's Administrative Appeal and the Reinstatement of Benefits.

Noga administratively appealed that decision to Reliance Standard's Quality Review Unit. As part of his appeal, he submitted updated medical records from his primary care physician and his physiatrist. His treating physicians noted that Noga continued to struggle with walking and balancing – often tripping or falling – and that he suffered from fatigue as well as decreased feeling in his feet.

Reliance Standard then tasked another registered nurse with reviewing Noga's appeal. In March 2018, that nurse determined that Noga's medical records supported an ongoing "lack of consistent work function at any level." Reliance Standard Claim Notes (Mar. 19, 2018) (App. 208). Based on the nurse's opinion, the senior benefits analyst assigned to the administrative appeal overturned the decision to terminate Noga's benefits on March 22, 2018.

### F. Reliance Standard's Self-Initiated Reevaluation and Eventual Termination of Benefits.

The next day, that same analyst changed course. Despite the decision to reinstate Noga's benefits – which was apparently made with awareness of both the nurse's opinion and the report of the outside physiatrist – the analyst requested two more peer reviews from outside medical professionals.

9

The same third-party vendor that secured the IME also selected an endocrinologist and an occupational medicine specialist to perform those peer reviews.

The endocrinologist did not examine Noga but performed a paper review of his records. Based only on that review of Noga's file, the endocrinologist concluded that Noga's diabetes was well controlled and that – solely from an endocrinology perspective – he could work on a full-time basis.

The occupational medicine specialist conducted the second peer review, again without examining Noga personally but reviewing only his medical records. Based solely on that paper review, the occupational medicine specialist concluded that Noga was capable of full-time work but noted that Noga's neurogenic muscular atrophy and diabetic polyneuropathy were "disease processes which [would] wax and wane over time." Occupational Medicine Specialist Peer Review at 11 (Apr. 6, 2018) (App. 1415).

In May 2018, relying on the prior physiatrist's IME report and the two new peer paper reviews, Reliance Standard reversed its reinstatement of Noga's benefits and upheld its initial termination decision. With that determination, Noga had no further recourse under the plan, and because the administrative remedies were exhausted, Reliance Standard notified Noga that he had a right to bring a civil action under 29 U.S.C. § 1132(a). *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) ("Except in limited circumstances . . . a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the

10

plan."); *see also Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002).

II.  PROCEDURAL HISTORY AND JURISDICTIONAL ANALYSIS

Consistent with the termination notice from Reliance Standard, Noga filed suit in the Court of Common Pleas of Lancaster County, Pennsylvania.  He asserted that the termination of his benefits was arbitrary and capricious, and he brought a claim under 29 U.S.C. § 1132(a)(1)(B) to reinstate his long-term disability and life insurance benefits.  Noga sued two defendants in their official capacities: Reliance Standard as a fiduciary and Fulton Financial Corporation Employee Benefit Plan as the employee welfare benefit plan.  *See Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 913 (7th Cir. 2013) (allowing a suit against an insurance company under § 1132(a)(1)(B) when the insurance company "decides contractual eligibility and benefits questions and pays the claims"); *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1207 (9th Cir. 2011) (en banc) (same); *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (recognizing that a plan and a plan administrator may be sued under § 1132(a)(1)(B)).[1]

---

[1] In creating a federal cause of action, § 1132(a)(1)(B) contains no textual limitation as to who may be sued.  *See* 29 U.S.C. § 1132(a)(1)(B); *Cyr*, 642 F.3d at 1205 ("There are no limits stated anywhere in § 1132(a) about who can be sued . . . ."). This Circuit has interpreted § 1132(a)(1)(B) as authorizing official-capacity claims but not individual-capacity claims. *See Graden*, 496 F.3d at 301.

11

Reliance Standard then filed a notice to remove the case to the United States District Court for the Eastern District of Pennsylvania. *See* 28 U.S.C. § 1441(a). ERISA grants concurrent original jurisdiction over § 1132(a)(1)(B) claims to state and federal courts. *See* 29 U.S.C. § 1132(e)(1). Thus, by bringing claims under § 1132(a)(1)(B), Noga's suit was within the original jurisdiction of the District Court, and it could be removed on that basis – if the other defendant, the Plan, joined in or consented to the notice of removal. *See* 28 U.S.C. §§ 1441(a), 1446(b)(2)(A). The Plan consented, and the case was removed to the District Court.

Once in federal court, Noga sought to proceed against only Reliance Standard. He twice invoked Federal Rule of Civil Procedure 41(a) to voluntarily dismiss the Plan. Dismissals under Rule 41(a) may be effectuated by stipulation or by notice, and a proper dismissal using either method is self-executing.[2] Noga first filed a stipulated dismissal before the Plan had entered an appearance in the case. The only other party that had entered an appearance, Reliance Standard, joined the stipulation, which did not state whether it was with

---

[2] *See State Nat'l Ins. Co. v. Cnty. of Camden*, 824 F.3d 399, 406–07 (3d Cir. 2016) ("Every court to have considered the nature of a voluntary stipulation of dismissal under Rule 41(a)(1)(A)(ii) has come to the conclusion that it is immediately self-executing. No separate entry or order is required to effectuate the dismissal." (citations and footnote omitted)); *In re Bath & Kitchen Fixtures Antitrust Litig.*, 535 F.3d 161, 165 (3d Cir. 2008) ("[A] filing under [Rule 41(a)(1)(A)(i)] is a notice, not a motion. Its effect is automatic: the defendant does not file a response, and no order of the district court is needed to end the action.").

or without prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). Because that first voluntary dismissal lacked an indication either way, it functioned as a dismissal without prejudice. *See id.* R. 41(a)(1)(B).

About four months later, without the Plan filing an answer or moving for summary judgment in the interim, Noga filed a notice of dismissal, again to dismiss the Plan voluntarily. *See id.* R. 41(a)(1)(A)(i). Like its predecessor, that voluntary dismissal did not state whether it was with or without prejudice. But under Rule 41, a second voluntary dismissal "operates as an adjudication on the merits," and thus that notice dismissed the Plan with prejudice. *Id.* R. 41(a)(1)(B).

The two remaining parties, Noga and Reliance Standard, then moved for summary judgment. In connection with its motion, Reliance Standard submitted the administrative record. Considering only that record – and not a later-filed affidavit from the senior benefits analyst who oversaw Noga's administrative appeal – the District Court determined that the termination of Noga's benefits was arbitrary and capricious. That conclusion resulted from the combined effect of two factors: Reliance Standard's structural conflict of interest (that it both determined eligibility for benefits and paid for benefits) and the procedural irregularities in Reliance Standard's termination of benefits. The District Court granted summary judgment in Noga's favor and ordered the retroactive reinstatement of his benefits. After an unsuccessful motion for reconsideration, Reliance Standard timely appealed.

The District Court's summary-judgment order is a final, appealable decision. *See* 28 U.S.C. § 1291. Through Noga's Rule 41(a) voluntary dismissals, all claims against the Plan

13

were dismissed with prejudice.[3]  Therefore, the District Court's summary-judgment order against the only other defendant, Reliance Standard, "ends the litigation on the merits," and constitutes a final decision sufficient for this Court's appellate jurisdiction. *Catlin v. United States*, 324 U.S. 229, 233 (1945); *see Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 244 (3d Cir. 2013) ("Generally, a dismissal with prejudice constitutes an appealable final order under § 1291." (citation omitted)).

On appeal, Reliance Standard argues that the District Court erred in two respects.  First, it contends that the District Court should have considered the analyst's affidavit.  Second, it submits that the District Court erred in concluding that the termination of Noga's benefits was arbitrary and capricious.

---

[3] Rule 41(a) provides a mechanism for a plaintiff to voluntarily dismiss an entire lawsuit, and this Circuit also recognizes that the rule allows a party to voluntarily dismiss all of its claims against a particular party.  *See Young v. Wilky Carrier Corp.*, 150 F.2d 764, 764 (3d Cir. 1945); *see also* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2362 (4th ed. 2020) (explaining that "the sounder view and the weight of judicial authority" are that Rule 41(a) permits dismissal of all claims against one party and does not require dismissal of all claims against all parties).

## III.  DISCUSSION

### A.  *The District Court Did Not Err by Excluding Reliance Standard's Proffered Affidavit.*

#### 1. The ERISA Record Rule and the Structural-Conflict Exception.

Under the ERISA record rule, judicial review of an ERISA fiduciary's discretionary adverse benefit decision is confined to the information contained in the administrative record.  *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010) (explaining that, "under most circumstances," the administrative record "cannot be supplemented during litigation" (quoting *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004))); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997) (evaluating a claim for long-term disability benefits based on the "whole record" (internal quotation marks omitted)), *abrogated on other grounds by Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 847 (3d Cir. 2011). The administrative record consists of the materials before the fiduciary who makes the benefit decisions on internal review, and it typically contains relevant plan documents (such as an insurance policy), the claim file (the claim, supporting information supplied by the claimant, as well as information related to the claim that was considered, collected, or generated by the fiduciary), and the fiduciary's final determination with respect to the claim.  *See Howley*, 625 F.3d at 793 ("[C]ourts generally must base their review of an administrator's decision on the materials that were before the administrator when it made the challenged decision."); *Mitchell*, 113 F.3d at 440 (explaining that for an adverse benefit determination, the "'whole' record consists of that evidence that was before the

15

administrator when he made the decision being reviewed" (citations omitted)); *see also* 29 C.F.R. § 2560.503-1(m)(8) (identifying categories of information relevant to a benefit determination).

Despite the clarity of the ERISA record rule, its origin is somewhat convoluted.  Statutory text does not conflict with the rule, but it does not compel a court to evaluate adverse benefit determinations based solely on the administrative record.  ERISA requires adequate written notice of an adverse benefit determination that "set[s] forth the specific reasons for such denial."   29 U.S.C. § 1133(1).   It also demands that any participant who receives an adverse benefit determination be afforded "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  *Id.* § 1133(2).  But nowhere does ERISA state that review of an adverse benefit determination is limited to the 'whole record' before the benefits decision-maker.  *Cf.* 5 U.S.C. § 706 (requiring judicial review of agency action based on the "whole record"); 42 U.S.C. § 405(g) (requiring judicial review of Social Security benefit determinations based on a "transcript of the record including the evidence upon which the findings and decision complained of are based").

That is not the only instance of statutory silence in ERISA.  It also omits the standard of judicial review for adverse benefit determinations.  The Supreme Court resolved that statutorily open question by holding that the standard depends on whether a plan grants discretion to the fiduciary who makes benefits decisions. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If a plan does not do so, then a court reviews an adverse benefit determination *de novo*.  *See id.*  But if a plan does confer discretionary authority on a fiduciary decision-

maker, then a court reviews an adverse benefit determination for an abuse of discretion under the arbitrary-and-capricious standard. *See id.*; *McCann v. Unum Provident*, 907 F.3d 130, 147 (3d Cir. 2018).

That standard bears heavily on the ERISA record rule. That is so because, pursuant to their ability to develop federal common law for ERISA regulated plans, *see Firestone*, 489 U.S. at 110, federal courts have imported several administrative-law principles into ERISA litigation.[4] And administrative law associates the arbitrary-and-capricious standard with a record-review requirement. *See* 5 U.S.C. § 706

---

[4] *See, e.g.*, *Glenn*, 554 U.S. at 117 (referencing administrative law for the proposition that courts may conduct a combination-of-factors analysis while reviewing ERISA adverse benefits determinations under the arbitrary-and-capricious standard); *Wolf v. Nat'l Shopmen Pension Fund*, 728 F.2d 182, 185–86 (3d Cir. 1984) (incorporating the administrative exhaustion requirement into ERISA civil enforcement actions); *Amato v. Bernard*, 618 F.2d 559, 566–67 (9th Cir. 1980) (recognizing that "the text of ERISA nowhere mentions the exhaustion doctrine," but that "sound policy requires the application of the exhaustion doctrine in suits under the Act"). *But see Borntrager v. Cent. States, Se. & Sw. Areas Pension Fund*, 425 F.3d 1087, 1092 (8th Cir. 2005) (eschewing the importation of administrative-law principles in assessing whether an order remanding to an ERISA plan administrator was a final, appealable decision); Mark D. DeBofsky, *The Paradox of the Misuse of Administrative Law in ERISA Benefit Claims*, 37 J. MARSHALL L. REV. 727, 730 (2004) (arguing that "federal courts have mistakenly incorporated administrative law principles into ERISA benefit decisions").

(authorizing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" based on a review of the "whole record or those parts of it cited by a party").

Drawing on administrative-law principles to fashion the common law for ERISA, this Circuit has linked the arbitrary-and-capricious standard to record review. *See Mitchell*, 113 F.3d at 440 (applying the whole-record requirement from the Social Security Act to arbitrary-and-capricious review under ERISA). Specifically, because discretionary adverse benefit determinations are reviewed under the arbitrary-and-capricious standard, those decisions are bound by the ERISA record rule. *See id.*; *see also Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 111 (2013) ("The Courts of Appeals have generally limited the record for judicial review to the administrative record compiled during internal review." (citing *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012)) (other citations omitted)). Conversely, this Circuit has held that the ERISA record rule does not apply to adverse benefit determinations subject to *de novo* review. *See Luby*, 944 F.2d at 1185 (holding that "*de novo* review over an ERISA determination between beneficiary claimants is not limited to the evidence before the [plan administrator]"). Thus, a plan that grants discretion to a fiduciary to make benefit determinations, by that same choice, elects to have those benefit decisions governed by the ERISA record rule.

That rule is not absolute, however. The administrative record focuses on a specific benefit claim, and for that reason, the record may lack information about a fiduciary's "potential biases and conflicts of interest." *Kosiba*, 384 F.3d at 67 n.5; *see also Howley*, 625 F.3d at 794 ("[A] conflicted

18

administrator, especially one whose decision-making has been affected by that conflict, is not at all likely to volunteer that information."). But any such structural conflict may be relevant to an adverse benefit determination. *See Glenn*, 554 U.S. at 111 (recognizing that a factor in determining whether a plan administrator abused its discretion is whether the administrator acted under a conflict of interest); *Firestone*, 489 U.S. at 115 (same). Despite its potential relevance, information regarding a structural conflict may be omitted from the administrative record due to the combination of information asymmetry and financial incentives: the participant may not know of the conflict, and the fiduciary has no financial incentive to disclose it. *See Howley*, 625 F.3d at 794 ("To allow an administrator the benefit of a conflict merely because it managed to successfully keep that conflict hidden during the administrative process would be absurd."). To account for the potential omission of that evidence, as a limited exception to the ERISA record rule, the administrative record may be supplemented to prove or disprove a structural conflict of interest or its severity. *See id.* ("[C]ourts plainly must be willing to consider evidence relating to 'the nature, extent, and effect on the decision-making process of any conflict of interest' revealed during the litigation process." (quoting *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1028 (9th Cir. 2008))); *Kosiba*, 384 F.3d at 67 n.5, 68 (allowing either party on remand to supplement the record with evidence of the plan's "actual funding mechanism" to prove whether the administrator "acted under a financial conflict of interest").

The exception to the ERISA record rule for structural conflicts is narrow and does not allow supplementation of the record with information related to the claim or the review

19

process.  *See, e.g.*, *Post v. Hartford Ins. Co.*, 501 F.3d 154, 168–69 (3d Cir. 2007) (rejecting a participant's reliance on medical reports that were not submitted to the plan administrator or made part of the record), *abrogated on other grounds by Miller*, 632 F.3d at 847; *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 & n.8 (3d Cir. 1993) (declining to consider "three additional medical evaluations" submitted by a participant to "support her claim of continued total disability" after the plan administrator's final decision), *abrogated on other grounds by Miller*, 632 F.3d at 847.  That is so because the justifications for the structural-conflict exception – information asymmetry and financial incentives – do not similarly apply to information about the claim or the review process.  Both the participant, who claims benefits, and the fiduciary, who evaluates the benefit claim, have incentives to develop the administrative record with respect to the benefit claim.  *See Jebian v. Hewlett Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003) ("ERISA is designed to promote a good-faith bilateral exchange of information on the merits of claims . . . .").  If the participant does not explain the claim or does not provide supporting information, then it is more likely that the fiduciary will deny the claim.  *See Heimeshoff*, 571 U.S. at 111 ("[T]o the extent participants fail to develop evidence during internal review, they risk forfeiting the use of that evidence in district court.").  Similarly, the fiduciary may insulate an adverse benefit determination from reversal by including in the record supporting rationales and evidence for its decision.  As both parties have adequate incentives to develop the record about a claim and its processing, the ERISA record rule prohibits supplementation of the administrative record with *post hoc* explanations for adverse benefit determinations.

20

2. Reliance Standard's Proffered Affidavit Cannot Be Considered.

Because the relevant insurance policies grant discretion over adverse benefit determinations to Reliance Standard, the ERISA record rule governs this controversy. Nonetheless, Reliance Standard seeks to supplement the administrative record with an affidavit from the senior benefits analyst responsible for Noga's administrative appeal.

The affidavit contextualizes and augments information in the claim file. In that sworn written testimony, the analyst explained that in reevaluating Noga's claim on administrative appeal, he originally sent it to an in-house nurse who had not previously worked on the claim, and that based on that nurse's review, he entered a claim note to reinstate benefits.[5] The analyst further averred that he later sought two peer reviews of Noga's medical records because "[w]hen an independent physician has performed a review, Reliance [Standard] does not rely on a nurse for a second opinion." Jackson Aff. ¶ 24 (App. 1991).

The proffered explanation for the two outside referrals could have been contemporaneously memorialized in the claim

---

[5] Perhaps suggestive of a desire to remove the initial claim note recommending reinstatement, the analyst also explained that the claims system did not permit him to delete that note. *See* Jackson Aff. ¶ 25 (App. 1991) ("[T]he claim system we use did not allow me to remove my March 22, 2018 claim note."); *see also id.* ¶ 22 (the March 22, 2018 claim note states, "Decision to terminate benefits overturned and reinstated effective 12/27/2017").

21

file. But it was not. And because it was not included in the administrative record, the ERISA record rule bars its consideration.

Nor does that proffered explanation qualify for the structural-conflict exception to the ERISA record rule. That exception permits supplementation of the administrative record only for information that tends to prove or disprove a structural conflict of interest or its severity. *See, e.g.*, *Howley*, 625 F.3d at 793–94 (endorsing consideration of extrinsic evidence of a plan administrator's conflict of interest). And here, Reliance Standard does not offer the analyst's affidavit to disprove or mitigate Reliance Standard's structural conflict of interest, which arises from its dual roles of determining eligibility for benefits and funding them. *See Glenn*, 554 U.S. at 112, 114; *Miller*, 632 F.3d at 847. Instead, Reliance Standard seeks to use the affidavit to provide context for procedural anomalies in the handling of Noga's claim. But an ERISA administrative record may not be supplemented with *post hoc* explanations for procedural irregularities. It makes no difference that Reliance Standard offers the affidavit in partial rebuttal to Noga's procedural-irregularity argument. Because procedural anomalies impugn a fiduciary's impartiality, a benefits decision-maker has an incentive to include in the administrative record information that explains procedural irregularities. Reliance Standard did not do so, and it may not augment the administrative record with such information in litigation.

*B. Due to the Combined Effect of a Structural Conflict of Interest and Two Significant Procedural Irregularities, Reliance Standard's Decision to Terminate Noga's Benefits Was an Abuse of Discretion.*

As explained above, Reliance Standard has discretionary authority over the disputed benefits decisions, and therefore its adverse benefit determinations are reviewed under the arbitrary-and-capricious standard. *See Glenn*, 554 U.S. at 111; *Firestone*, 489 U.S. at 115; *McCann*, 907 F.3d at 147. This standard is nominally deferential: a fiduciary's decision "will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone*, 489 U.S. at 111).

Nonetheless, there are several ways in which a fiduciary who makes benefits decisions may fail the arbitrary-and-capricious standard. An adverse benefit determination made "without reason, unsupported by substantial evidence or erroneous as a matter of law" qualifies as arbitrary and capricious. *Abnathya*, 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)); *see also Grossmuller v. Int'l Union, United Auto. Workers, Loc. 813*, 715 F.2d 853, 858 n.5 (3d Cir. 1983) (requiring a plan administrator to "consider the position of both sides before rendering a decision" (emphasis and citation omitted)). In addition, a combination of case-specific structural and procedural factors may demonstrate that a fiduciary abused its discretion in making an adverse benefit determination, and such a decision would likewise fail arbitrary-and-capricious review. *See Glenn*, 554 U.S. at 116–17; *Est. of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009); *see also Miller*, 632 F.3d at 845 n.2 ("In the ERISA context, the arbitrary and

23

capricious and abuse of discretion standards of review are essentially identical." (citation omitted)).

The structural consideration under the combination-of-factors analysis focuses on the role of financial incentives in the plan's administration. *See Post*, 501 F.3d at 162. When the same entity administers a plan and pays the benefits due under the plan, it has a structural conflict of interest. *See Glenn*, 554 U.S. at 112, 114; *see also Miller*, 632 F.3d at 847 ("[A] conflict arises where an employer both funds and evaluates claims." (citation omitted)). But that conflict alone does not render a fiduciary's adverse benefit determination an abuse of discretion. *See Glenn*, 554 U.S. at 117–18; *Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 250–51 (3d Cir. 2017); *Fleisher*, 679 F.3d at 122 n.3 (stating that a conflict of interest "is not . . . inherently a determinative factor" (citation omitted)). Rather, "that conflict must be weighed as [one] factor," *Firestone*, 489 U.S. at 115 (internal quotation marks and alteration omitted), along with "the process . . . used in denying benefits," *Miller*, 632 F.3d at 845. *See Glenn*, 554 U.S. at 111, 118–19.

The procedural factor examines the presence or absence of irregularities in the handling of benefit claims. Not every anomaly carries great weight; a fiduciary, even one with a structural conflict of interest, need not maintain a procedurally immaculate claim file to avoid an abuse-of-discretion finding. But critically, under the combination-of-factors analysis, procedural irregularities gain significance the more closely that they align with the financial incentives that create a structural conflict of interest. *See Glenn*, 554 U.S. at 117. In that vein, caselaw has identified several procedural irregularities that bear directly on the financial incentives at the core of a

24

structural conflict.  *See Miller*, 632 F.3d at 848–55; *Post*, 501 F.3d at 166–68; *Kosiba*, 384 F.3d at 67–68; *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393–94 (3d Cir. 2000), *abrogated on other grounds by Miller*, 632 F.3d at 847; *see also Glenn*, 554 U.S. at 118.  As explained below, this case involves one such procedural irregularity: requests for outside examination or review that are unusual in their timing, impetus, or scope.

### 1. Reliance Standard Has a Structural Conflict of Interest.

No one disputes that Reliance Standard has a structural conflict of interest.  The group insurance policies, which were included in the administrative record, state that Reliance Standard both makes benefits eligibility decisions and funds those benefits.  For an ERISA fiduciary, such a dual role constitutes a conflict of interest.  *See Glenn*, 554 U.S. at 112, 114; *Miller*, 632 F.3d at 847.

Under the structural-conflict exception to the ERISA record rule, a court may consider extra-record evidence that would affect the weight afforded to a structural conflict of interest.  Neither party offers such evidence.  Noga does not submit evidence, such as "a history of biased claims administration," that would enhance the weight given to Reliance Standard's structural conflict of interest.  *Glenn*, 554 U.S. at 117 (citation omitted).  Reliance Standard likewise offers no evidence to contextualize or mitigate its structural conflict of interest.  Although evidence that a conflicted plan administrator "has taken active steps to reduce potential bias and to promote accuracy" may minimize the effect of a structural conflict of interest "perhaps to the vanishing point," Reliance Standard

25

did not seek to demonstrate, for example, that it "wall[ed] off claims administrators from those interested in firm finances" or "impos[ed] management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* Instead, as explained above, the affidavit proffered by Reliance Standard attempted to explain only a procedural irregularity. Thus, here, neither party provides a basis for affording the structural conflict-of-interest factor either enhanced or diminished weight.[6]

---

[6] Reliance Standard's use of a third-party vendor to select and retain outside medical professionals to perform examinations and reviews may superficially appear to enhance the structural integrity of its claim-review process. But Reliance Standard does not make that argument, and on closer inspection, such outsourcing may exacerbate the underlying structural conflict because it allows omission of several potentially relevant pieces of information from the administrative record. For instance, the administrative record lacks information regarding important aspects of the third-party vendor's decision-making, such as the criteria that the vendor used to select the examiners and reviewers; the universe of candidates it considered for those roles; the frequency with which the vendor selected these reviewers and examiners; and the compensation that each received. Perhaps more significantly, the administrative record lacks information on Reliance Standard's methodology for selecting the third-party vendor and the terms of its arrangement with that vendor. Noga did not seek any of this extra-record information. Yet due to the combined effect of his inability to access that information and the potential alignment of those unknown facts with Reliance Standard's financial incentives, such information may fall within the structural-conflict exception.

26

2. Two Procedural Irregularities Stand Out in Reliance Standard's Handling of Noga's Benefit Claims.

Noga identifies two procedural irregularities related to the termination of his benefit claims: one in the initial benefit termination decision and the other on administrative appeal.

The first procedural anomaly relates to the unusual timing of and impetus for the IME request.  According to Reliance Standard, that decision was prompted by indications from Noga's treating physicians that his legs were improving, that he no longer needed leg braces, and that he could walk up to a mile in the pool.  But Reliance Standard had that information since August and September of 2016 – more than a year earlier.  And during that intervening year, three different in-house nurses considered those facts, and each time they recertified that Noga remained totally disabled, with the latter two certifications occurring in August and September of 2017.  Yet less than a month after the latest nurse review – and "without receiving any new medical information," *Miller*, 632 F.3d at 848 – Reliance Standard referred Noga for an IME.  Although fiduciary decision-makers should not be "penalize[d] . . . for seeking independent medical examinations at appropriate stages of the claims determination process," *Kosiba*, 384 F.3d at 68, the timing of and professed need for the IME were irregular.

The second procedural anomaly concerns a request for outside examination that is unusual in its timing, impetus, and scope.  On administrative appeal, a Reliance Standard senior benefits analyst overturned his initial termination decision and reinstated Noga's benefits based on the recommendation of an

27

in-house nurse who had not previously worked on Noga's claim. But the day after he reinstated Noga's benefits, the same analyst reversed course: he put a hold on the reinstatement of Noga's benefits and requested two peer reviews of Noga's medical records. That request for outside examination is unusual in its timing (a day after reinstating benefits), its impetus (the administrative record does not explain the reason for this change of course), and its scope (seeking paper reviews from *two* additional outside medical professionals). *See Post*, 501 F.3d at 166 (noting that "courts must . . . consider the circumstances that surround an administrator ordering a paper review").

> 3. In Combination, the Structural and Procedural Factors Demonstrate that Reliance Standard Abused Its Discretion in Terminating Noga's Benefits.

Both of those procedural irregularities have a significant connection to the financial incentives at the core of Reliance Standard's structural conflict of interest.

The first procedural irregularity – the unusual timing of and impetus for the IME – directly led to Reliance Standard's initial termination of benefits. Two months after that IME request, once the IME report was completed, and without any other updates to Noga's medical files, Reliance Standard reversed its finding of total disability. The request for the IME by itself suggests "procedural bias," *Kosiba*, 384 F.3d at 67, because it constituted "[i]nconsistent treatment of the same facts" that Reliance Standard's in-house nurse considered less than a month before the IME request, *Pinto*, 214 F.3d at 393. And because that unusual decision resulted in the termination

28

of benefits, it strongly suggests that Reliance Standard was acting not as a "disinterested fiduciary" but as a financially motivated actor seeking to pay less money out in benefit claims. *Kosiba*, 384 F.3d at 67.

The second procedural irregularity – the unusual timing of, impetus for, and scope of requests for outside review – is similarly tied to Reliance Standard's financial interests. In a near-immediate backtracking of his decision to reinstate Noga's benefits on administrative appeal, a Reliance Standard analyst requested two paper reviews of Noga's medical file from outside medical professionals. Relying on those reviews and the IME report from the physiatrist retained by the third-party vendor, the analyst reversed the reinstatement of benefits and denied Noga's benefit claims. The sudden request for those reviews directly changed the financial outcome – again in Reliance Standard's favor.

Taken together, the structural and procedural factors demonstrate an abuse of discretion. Though its own nurses consistently recertified Noga's eligibility for benefits, Reliance Standard disregarded those recommendations and sought an IME and two peer reviews – questionable choices that led directly to the termination of Noga's benefits. Those decisions look no better from a distance: in an eight-month period, Reliance Standard sustained benefits, terminated benefits, reversed the termination, and then reversed the reversal – with the end result that Reliance Standard no longer had to fund either Noga's long-term disability or his life insurance. *See Glenn*, 554 U.S. at 118 (sustaining the conclusion that a conflicted plan administrator abused its discretion where the procedural irregularities were "financially advantageous" for the plan).

29

Nor is this an instance in which an abundance of evidence supporting the denial of the benefits claim overcomes the combination of a structural conflict of interest and procedural irregularities. *See Miller*, 632 F.3d at 846 (recognizing that neither a structural conflict of interest nor procedural irregularities may "tip the scales in favor of finding that the administrator abused its discretion" if there is an abundance of evidence of a claimant's misconduct (alterations omitted) (quoting *Est. of Schwing*, 562 F.3d at 526)). Without the three procedurally irregular outside reports, the record evidence, which includes reports from Noga's treating physicians as well as multiple assessments by Reliance Standard's in-house nurses, favors the continued award of benefits to Noga.

In sum, the close alignment of the procedural irregularities with the financial incentives creating the structural conflict demonstrates that Reliance Standard abused its discretion: its conflict "actually infected" its decision to terminate Noga's benefits. *Dowling*, 871 F.3d at 251.

* * *

For these reasons, the District Court properly ordered the retroactive reinstatement of Noga's benefits. *See Miller*, 632 F.3d at 856–57. We will affirm.

30