**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1829
_____

ELLEN NEEDHAM, Personal Representative of the Estate of Jonathan Needham;
WALTER DOWMAN, a/k/a Jason Dowman,
Appellants

v.

CHUBB CORP, A New Jersey Corporation; BELLEMEADE DEVELOPMENT CO, A
Florida Corporation; HALIFAX PLANTATION GOLF MANAGEMENT INC, A
Florida Corporation; RETIREMENT ADMINISTRATION COMMITTEE, Plan
Administrator
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-20-cv-03470)
District Judge:  Honorable Peter G. Sheridan
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 24, 2023
_____

Before:  RESTREPO, PHIPPS, and ROTH, *Circuit Judges*.

(Filed: December 18, 2023)
_____

OPINION[*]
_____

PHIPPS, *Circuit Judge*.

After working at a golf club for over twenty years, two employees suspected that

they were wrongfully denied participation in employee benefit plans offered by a

corporation affiliated with the golf club.  The two employees filed a claim with the

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

committee that administers those plans. The committee denied the claim initially and again upon re-evaluation after a remand order from a related lawsuit. The two employees then filed this suit, and after concluding that the committee did not act arbitrarily or capriciously, the District Court entered judgment against them on each of their claims.

One of the employees and the surviving spouse of the other now appeal that judgment. In exercising appellate jurisdiction, 28 U.S.C. § 1291, and reviewing *de novo* the District Court's conclusions, we will affirm.

## FACTUAL BACKGROUND

The Chubb Corporation, an insurance company, offered three employee benefit plans. Those were the Chubb Pension Plan, the Chubb Capital Accumulation Plan, and the Employee Stock Ownership Plan (collectively, the 'Plans').

Chubb also wholly owned Bellemead Development Corporation, a real-estate management company. Chubb permitted Bellemead to participate in the Plans, and Bellemead elected to do so, which enabled its employees to participate in the Plans.

Bellemead wholly owned Halifax Plantation Golf Management, Inc. ('Halifax Golf'). Halifax Golf operates the golf club at Halifax Plantation, a planned community in Ormond Beach, Florida. As a Chubb affiliate, Halifax Golf could have taken steps to offer the Plans to its employees, but it did not do so.

Jonathan Needham and Walter Dowman worked at Halifax Plantation's golf club starting in the 1990s. Needham worked at the club in 1993, and then again from 1996 to 2017 as the club's general manager. In that capacity, he managed the clubhouse and restaurant, oversaw cleaning schedules, coordinated marketing efforts, and helped with information technology. In 2014, Needham was promoted to President of Halifax Golf,

2

but still maintained his role as general manager.  Dowman, meanwhile, worked at the club as a golf pro from 1993 to 2018.

For the first few years that Needham and Dowman worked at the golf club, Halifax Golf did not have its own payroll system.  Their paychecks, embossed with the Chubb logo, as well as their W-2 forms, came from Bellemead instead.

Beginning in 1997, Halifax Golf, though still a wholly owned subsidiary of Bellemead, took steps to decrease its operational reliance on Bellemead and Chubb.  A memorandum drafted in January of that year listed as agenda items for a "Strategy Meeting" that Halifax Golf would "[w]ork to isolate departments" and "[m]ake preparations to leave Chubb payroll."  App. 221 (1/22/1997 Memorandum).  Then, in March 1998, Halifax Golf created its own payroll system and transitioned its employees away from Bellemead and Chubb's system.  By March 1998, Halifax Golf was directly paying Needham and Dowman.

Halifax Golf also restructured its employee benefit plans.  In 1998, it moved to terminate its employees' coverage under a Chubb-sponsored disability plan.  It also segregated Halifax Golf employees into a separate subgroup for billing and administrative purposes under a different insurance plan.  Finally, in 1999, Halifax Golf established its own employee benefit plan, the Halifax Plantation 401(k) Profit Sharing Plan & Trust.  Needham and Dowman participated in that plan.  And while Halifax Golf remained a Chubb affiliate eligible to participate in the Plans, it still declined to do so.

In March 2014, soon after Halifax Golf promoted Needham to company president, he discovered that his predecessor in office had participated in the Plans.  Although Needham's predecessor had also served as the Vice President of Bellemead, the comparative treatment bothered Needham.  If his predecessor participated in the Plans,

3

then, in Needham's view, other employees of Halifax Golf who could be deemed employees of Bellemead should have been eligible to participate in the Plans as well.

To vindicate that concern, Needham teamed up with Dowman to file a joint claim for participation in the Plans with Chubb's Retirement Administration Committee. But the Committee denied their claim on the ground that Needham and Dowman each failed to satisfy the Plans' definition of an eligible 'Employee.'

According to the Committee's interpretation of the Plans, a person had to satisfy two conditions to qualify as an eligible 'Employee.' First, he or she must have been on the domestic payroll of a participating employer. Second, he or she must have received compensation for employment services provided to that employer.

The Committee recognized that Needham and Dowman satisfied the first condition: they were on Bellemead's domestic payroll until February or March 1998.

The Committee, however, concluded that neither satisfied the second condition. It explained that the employment services they provided were to Halifax Golf – not Bellemead. Thus, they could not be 'Employees' of Bellemead for purposes of the Plans. Since Bellemead had adopted the Plans, and Halifax Golf had not, the Committee, in the exercise of its discretionary authority as the administrator of the Plans, rejected Needham and Dowman's claim for benefits.

## PROCEDURAL HISTORY

To challenge the Committee's rejection of their claim, Needham and Dowman commenced suit in District Court in November 2016. They sued the Committee along with Chubb, Bellemead, and Halifax Golf. Needham and Dowman's claims were grounded in the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a), and were thus within the District Court's original jurisdiction, *see id.* § 1132(e)(1).

4

In response, the defendants filed dispositive motions. The District Court granted the motions by the three corporations and entered summary judgment in their favor, reasoning that no defendant other than the Committee had discretion to administer benefits under the Plans. But the District Court denied the Committee's motion and remanded for the Committee to reconsider whether Needham and Dowman performed any employment services for Bellemead.

On administrative remand, Needham and Dowman asserted that the corporate division between Bellemead and Halifax Golf – at least during the mid-1990s – was artificial. They argued that Halifax Golf was nothing more than an alter-ego of Bellemead and that there was no meaningful distinction between the employees of Halifax Golf and those of Bellemead.

The Committee evaluated those challenges on remand. It considered around eight hundred pages of additional documentation. It also interviewed members of Halifax Golf's management. And it considered a two-page declaration from Needham detailing his and Dowman's experience working at the golf club. After doing so, it reaffirmed its previous denial of benefits on January 27, 2020.

To challenge that determination, Needham and Dowman commenced this suit in District Court. Needham passed away shortly afterwards, and his surviving spouse, as the representative of his estate, was substituted for him as a party. As alleged in an amended complaint filed against each of the same defendants, Needham's representative and Dowman pursued claims for wrongful denial of benefits under ERISA and breach of fiduciary duty. They also sought an injunction to prevent further violations of the statute.

The four defendants filed dispositive motions. After concluding that the Committee's denial of benefits was not arbitrary or capricious and reiterating that the

5

three corporate defendants lacked authority to administer the Plans, the District Court granted those motions.

Needham's representative and Dowman timely appealed the resulting final decision, bringing the matter within this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291.

## DISCUSSION

On appeal, Needham's representative and Dowman challenge the second eligibility condition identified by the Committee – the provision of employment services to a participating employer. They contest the Committee's interpretation of the Plan documents to create that condition, and they dispute factually that the condition is unmet. Under the deferential arbitrary-and-capricious standard applicable for reviewing denial-of-benefits decisions by plan administrators who are vested with discretionary authority to interpret the terms of a benefit plan and who determine eligibility based on those terms, *McCann v. Unum Provident*, 907 F.3d 130, 147 (3d Cir. 2018), neither argument succeeds.

Other arguments that were available to the parties have not been presented in the appellate briefing. By not developing a separate challenge to the District Court's conclusion that the three corporate defendants lacked authority to administer the Plans, Needham's representative and Dowman have forfeited their only preserved arguments against those defendants on appeal. *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017). For that reason, it is not necessary to address the

6

*res judicata* and collateral estoppel concerns mentioned, but not developed, by Chubb, Bellemead, and Halifax Golf in their appellate brief. *See* Fed. R. App. P. 28(a)(8), (b).[1]

### A. The Committee Did Not Arbitrarily or Capriciously Interpret the Plan Documents.

To identify the second requirement for Plan eligibility, the Committee considered several defined terms in the Plans. Chubb's Pension Plan limited participation to "Employee[s]." Supp. App. 32–35 (7/12/2016 Committee Letter). It further defined the term "Employee" as any person "in the employment in the United States or on the United States payroll of an Employer and who receives Compensation from the Employer." *Id.* at 32–33, 36. Based on that text, the Committee determined that it was not enough for Needham and Dowman to have been on Bellemead's domestic payroll: they must also have received 'Compensation' from Bellemead. The Committee understood the term 'Compensation' to refer to "the aggregate remuneration received by an Employee . . . for Service with an Employer." *Id.* at 37. And 'Service with an Employer' meant "any period of employment . . . as an Employee of an Employer." *Id.* From those interlocking definitions, which had similar limitations to those in the other two plans, the Committee concluded that Needham and Dowman were required to provide employment services to Bellemead to participate in the Plans.

Needham's representative and Dowman argue that such a reading is unreasonable based on several of the five factors this Circuit identified for consideration in assessing the reasonableness of an ERISA committee's interpretation of a benefit plan. *See Howley*

---

[1] Much of what our concurring colleague has to say on the values served by the barring of re-litigation of claims is salutary, but it is all inapplicable. This appeal does not implicate *res judicata*: that affirmative defense would apply at most to claims rejected by the District Court and not pursued on appeal. So, to substantively address *res judicata* would be to render an advisory opinion.

*v. Mellon Fin. Corp.*, 625 F.3d 788, 795 (3d Cir. 2010). They contend that the Committee's denial of their claims was inconsistent with the goals of the Plans. *See id.* (identifying consistency with the goals of a plan as one of the factors used to assess the reasonableness of a plan administrator's interpretation of a plan). But they fail to identify a textual basis in the Plans or a past practice by the Committee that would allow the conclusion that one of the goals of the Plans was to make benefits available to everyone on Bellemead's payroll – even those who never provided any service to Bellemead. They also argue that the Committee's interpretation rendered language in the Plans meaningless or internally inconsistent, and was contrary to the clear language of the Plans. *See id.* (identifying the rendering of plan language as meaningless or internally inconsistent and in contradiction with the clear language of a plan as factors used to assess the reasonableness of a plan administrator's interpretation of a plan). Although the language in the Plans is seemingly circular at times, Needham's representative and Dowman do not present a persuasive basis for interpreting the Plans' definitions of 'Employee' and 'Compensation' as allowing an employee to participate in the Plans simply because he or she received paychecks from a participating employer. Without more, Needham's representative and Dowman fail to demonstrate that the Committee's interpretation of the Plan documents was arbitrary or capricious.

      **B.**    **It Was Not Arbitrary or Capricious for the Committee to Conclude that Needham and Dowman Worked Only for Halifax Golf.**

Needham's representative and Dowman also dispute the Committee's denial of benefits under its own interpretation of the Plans. They advance three arguments in

support of that contention, but none overcomes the deference owed to the Committee as the administrator of the Plans. *See McCann*, 907 F.3d at 147.

Their first argument is based on Halifax Golf's transition away from Chubb and Bellemead in the late 1990s. They contend that before that assertion of corporate independence, the services that Needham and Dowman provided were to Bellemead.

The Committee provided a reasoned basis for rejecting that argument. It reviewed a January 1997 memorandum that references an effort to isolate departments. But that alone did not persuade the Committee. The same document indicates that prior to the transition, Needham's job responsibilities consisted of golf-related functions, with other employees handling the real-estate and construction-related matters associated with Bellemead's core business. The Committee also examined additional documentation bearing on Needham and Dowman's job responsibilities and concluded that both of them performed purely golf-related services for Halifax Golf, as opposed to real-estate or construction work for Bellemead. The Committee was likewise not convinced by Needham and Dowman's supposed participation in other Chubb-sponsored plans before 1998 because those plans had different eligibility criteria. With little support in the record other than Needham's own declaration, which asserted in a conclusory manner that he rendered services for Bellemead, the Committee rejected this basis for Needham and Dowman's claim. That conclusion was not arbitrary or capricious.

As a related, second argument, Needham's representative and Dowman contend that Halifax Golf abused its corporate form in the 1990s. They assert that Halifax Golf was a sham corporation used to avoid paying benefits to certain employees and that its corporate form must be disregarded in determining their eligibility under the Plans. But the Committee found that Halifax Golf observed all corporate formalities, filed its own

9

tax returns, used its own employer identification number, and paid unemployment insurance on behalf of its employees. And based on telephone interviews with Halifax Golf's management, the Committee concluded that Halifax Golf had always been intended to make a profit, was not considered a mere loss leader for Bellemead's real-estate business, and was managed apart from Bellemead. The Committee also cited more recent evidence of Halifax Golf's distinct corporate identity: the company was sold as a separate going concern in 2018, independent of the rest of Bellemead's real-estate business.

The Committee considered countervailing evidence as well. It appreciated that Halifax Golf may have been initially undercapitalized and financially dependent on Bellemead. The Committee also recognized that Halifax Golf and Bellemead had a few shared-service workers and management personnel in common. But the Committee explained that the close initial relationship between Halifax Golf and Bellemead was not "unusual under the circumstances" and, in light of the record as a whole, did not require ignoring Halifax Golf's corporate form for purposes of determining Needham and Dowman's eligibility under the Plans. Supp. App. 76 (9/13/2019 Committee Letter). Thus, the Committee's rejection of this second argument was not arbitrary or capricious.

The third challenge relies on designations internal to Bellemead and Halifax Golf's personnel system. That system designated Needham and Dowman as 'ORU.' The Committee concluded that employees with that designation "were consistently treated as ineligible to participate in the Plans" and "found that this consistent practice, in terms of administration and application of the Plans, weighed heavily against Mr. Needham's and Mr. Dowman's claim." *Id.* at 77. Needham's representative and Dowman respond that three ORU-designated employees participated in the Plans, as did a fourth employee who

10

they say worked closely with Halifax Golf.  But that fourth employee also provided services to Bellemead.  And the Committee found that, in fact, the three other ORU-designated employees were *not* eligible to participate in the Plans because they had transferred from Bellemead to another non-participating employer.  As a result, it was not arbitrary or capricious for the Committee to reject this final argument.

## CONCLUSION

The Committee considered the record as a whole, and its denial of Needham and Dowman's claim was not "without reason," "unsupported by substantial evidence," or otherwise arbitrary or capricious.  *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 275 (3d Cir. 2021) (internal quotation marks omitted).  Because the Committee reasonably concluded that Needham and Dowman were not eligible to participate in the Plans, the District Court did not err in rejecting their claims for wrongful denial of benefits and breach of fiduciary duty or in denying their request for an injunction.  Accordingly, we will affirm the District Court's judgment.

11

ROTH, J., Concurring

You may consider me an old curmudgeon, insisting on the judicial standards of many years ago. I hope I am. I believe that there are certain judicial precepts that are too vital to the proper running of the courts to be ignored. One of these is *res judicata*: When final judgment has been entered in an action, that judgment precludes a second suit between the same parties on the same cause of action. My colleagues problematically ignore essential principles of *res judicata*.[1] Therefore, I write separately to emphasize that it is essential that we apply its principles.

Needham and Dowman first sued the four defendants—Chubb, Bellemead, Halifax Golf, and the Committee—in 2016.[2] Their complaint raised two claims against all defendants: to enjoin further violations of ERISA, under 29 U.S.C. § 1132(a)(3), and to recover benefits, under 29 U.S.C. § 1132(a)(1)(B). The parties had a full and fair opportunity to litigate the matter and the District Court completely addressed both claims. The District Court ultimately granted summary judgment in favor of Chubb, Bellemead, and Halifax Golf, but denied summary judgment as to the Committee.[3] Because it found that the Committee had failed to adequately consider several documents that Needham

---

[1] While the Supreme Court has stated in *Arizona v. California*, 530 U.S. 392, 412–13 (2000), that "trial courts must be cautious about raising a preclusion bar *sua sponte*, thereby eroding the principle of party presentation so basic to our system of adjudication," *Arizona* is an Indian water rights case between states. The question behind the quote here was whether a certain issue could have been decided in the earlier suit, thereby preluding its assertion in the second suit. Such an issue is far different from the one in this case: the relitigation of the identical suit over the vociferous objection in the District Court by the appellees.

[2] Complaint, *Dowman*, 3:16-cv-08129, ECF No. 1, ¶¶ 38–63 (D.N.J. Nov. 1, 2016).

[3] *Dowman*, 2019 WL 1587084, at *9 (D.N.J. Apr. 11, 2019).

1

and Dowman had referred to in their briefs, the court remanded the remaining claims against the Committee to the Committee, so it could then consider those documents.[4] On administrative remand, the Committee once again denied Needham and Dowman's claims for benefits.[5] Needham and Dowman did not appeal the outcome of the first case.

In 2020, Needham and Dowman sued the same four defendants and advanced the same argument: that they were entitled to receive ERISA benefits.[6] In this second lawsuit, they brought the same exact claims as in the 2016 lawsuit, as well as an additional third claim: breach of fiduciary duty, under 29 U.S.C. § 1132(a)(3).[7] District courts have, however, dismissed breach of fiduciary duty claims in similar instances after concluding that the claim is "nothing more than a garden-variety, denial-of-benefits claim that has been improperly pled as a breach of fiduciary duty claim."[8] Moreover, as elaborated below, the plaintiffs should have brought this third claim in the initial suit.[9] Despite the addition of the third claim, the operative complaints in both cases were essentially identical.

---

[4] *Id.*

[5] SA83 (1/27/2020 Committee Letter).

[6] A188.

[7] A188; Amended Complaint, *Dowman*, 3:20-cv-3470, ECF No. 8, ¶¶ 42–72 (D.N.J. Nov. 25, 2020).

[8] *Laufenberg v. Northeast Carpenters Pension Fund*, No. 17-1200, 2019 WL 6975090 (D.N.J. Dec. 19, 2019) (dismissing § 1132(a)(3) claim as duplicative of benefits claim); *see also Plastic Surgery Center PA v. Cigna Health & Life Ins. Co.*, No. 17-2055, 2018 WL 2441768, *13–14 (D.N.J. May 31, 2018) (same); *Anonymous Oxford Health Plan Member v. Oxford Health Ins.*, No. 12-2367, 2012 WL 12929913, *2–3 (D.N.J. Dec. 27, 2012) (same).

[9] *Res judicata* applies to claims that could have been brought in the initial suit. *See C.I.R. v. Sunnen*, 333 U.S. 591, 597 (1948); *Duhaney v. Attorney General of the United States*, 621 F.3d 340 (3d Cir. 2010).

Defendants again filed a motion for summary judgment, arguing in part that *res judicata* precluded the plaintiffs from bringing this repeated suit.[10]  The District Court granted that motion but failed to address the *res judicata* argument.[11]  In doing so—and in failing to dismiss the case outright on *res judicata* grounds well before summary judgment—the court relitigated a matter which it had previously decided.[12]  It should not have done so.

"[R]es judicata applies to repetitious suits involving the same cause of action."[13]  Under this rule:

> when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit . . . are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'[14]

In other words, a second suit should be precluded where there is "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action."[15]  However, the causes of action in

---

[10] A77–81.

[11] A175–76 (D. Ct. Order); A189–90, 198, 201 (D. Ct. Op.).

[12] The District Court's 2022 opinion explicitly recognized the identical nature between the 2016 and 2019 lawsuits.  It states:  "The dispute previously came before me in November 2016," A180; "In the 2016 lawsuit, I partially granted Defendants' motion for summary judgment . . . for the same reasons I do herein," A185; "The amended complaint largely mirrors the 2016 Lawsuit in that it repeats the two claims from the 2016 Lawsuit," A188; "The same issue was presented in the 2016 lawsuit and there is nothing herein which changes the result.  I addressed the issue in the 2016 Lawsuit," A189.

[13] *C.I.R.*, 333 U.S. at 597.

[14] *Id.* (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 352 (1876)); *see also Duhaney*, 621 F.3d at 347 (citing *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2009).

[15] *In re Mullarkey*, 536 F.3d at 225.

both cases need not be identical.[16]  "Rather, we look toward the 'essential similarity of

the underlying events giving rise to the various claims.'"[17]  This principle is in keeping

with the established requirement that a plaintiff must "present in one suit all the claims

for relief that he may have arising out of the same transaction or occurrence."[18]

Res judicata should be "strictly enforced and liberally applied."[19]  The Supreme

Court made this clear in Federated Dep't Stores, Inc. v. Moitie,[20] in which the Court

explained that:

> This Court has long recognized that public policy dictates that there be an
> end of litigation; that those who have contested an issue shall be bound by
> the result of the contest, and that matters once tried shall be considered
> forever settled as between the parties.  We have stressed that the doctrine of
> res judicata is not a mere matter of practice or procedure inherited from a
> more technical time than ours.  It is a rule of fundamental and substantial
> justice, of public policy and of private peace, which should be cordially
> regarded and enforced by the courts.

Allowing judgments to be voidable "would result in creating elements of

uncertainty and confusion and in undermining the conclusive character of judgments

. . . ."[21] The purpose of the doctrine of res judicata is to avert such consequences.[22]  The

rule "rests upon considerations of economy of judicial time and public policy favoring

the establishment of certainty in legal relations."[23]  The Supreme Court has also stated

---

[16] See Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 963 (3d Cir. 1991).
[17] Id. (quoting Davis v. United States Steel Supply, 688 F.2d 166, 171 (3d Cir. 1982) (en banc)).
[18] United States v. Athlone Industries, Inc., 746 F.2d 977, 984 (3d Cir. 1984) (internal quotations omitted).
[19] Purter v. Heckler, 771 F.2d 682, 690 (3d Cir. 1985); see C.I.R., 333 U.S. at 597.
[20] 452 U.S. 394, 401 (1981).
[21] Id. (quoting Reed v. Allen, 286 U.S. 191, 201 (1932)).
[22] Id.
[23] C.I.R., 333 U.S. at 597.

that *res judicata* is "central to the purpose for which civil courts have been established, the conclusive resolution of the disputes within their jurisdictions."[24]  Preventing plaintiffs "from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."[25]  For all of these reasons, federal courts are directed to preclude repeated claims under *res judicata sua sponte*.[26]

Here, my colleagues claim "it is not necessary to address the *res judicata . . .* concerns mentioned, but not developed by Chubb, Bellemead, and Halifax Gold" on appeal.[27]  I disagree.  The District Court should have determined that the second suit— which was essentially identical to the first—was precluded by *res judicata*.  Even though the plaintiffs were unsatisfied with the outcome of the first suit, they were nevertheless "bound by the result of the contest," which should have been "forever settled."[28]  The District Court's decision to relitigate the matter undermined the finality of its initial judgment—a circumstance which the Supreme Court has explicitly called on the courts to prevent.[29]  We can and should rectify that error here.[30]

---

[24] *Montana v. United States*, 440 U.S. 147, 153 (1979).

[25] *Id.* at 153–54.

[26] *See Moitie*, 452 U.S. at 401; *Arizona v. California*, 530 U.S. 392, 412 (2000).

[27] NPO at 7.

[28] *Moitie*, 452 U.S. at 401.

[29] *See id.*

[30] Circuit courts may dismiss claims based on *res judicata sua sponte* even if the parties did not fully brief the issue.  *See Arizona*, 530 U.S. at 412; *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (dismissing an entire claim sua sponte based on judicial estoppel and noting that "even an appellate court may raise the estoppel on its own motion"); *see also*

I agree that Needham and Dowman were not eligible to participate in the Plans but I believe that the District Court should have precluded the second lawsuit from being brought. If we do not dismiss this action on res judicata grounds but allow the judgment on the merits to stand, we will be indicating to District Judges in the Third Circuit and to litigants through the country that our Court will allow litigants a second bite of the apple. I don't believe that we should send out such a message.

For the above reasons, I write separately to urge that this appeal be dismissed on res judicata grounds.

---

*Salahuddin v. Jones*, 992 F.2d 447, 449 (1993) (explaining that *res judicata* was "not only appropriate but virtually mandatory in this case, whether or not the appellees raised *res judicata*" because that doctrine "is founded in part on the strong public interest in economizing the use of judicial resources"), *cert. denied*, 510 U.S. 902 (1993).