**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-2636
_____

RHONDA HAWKS

v.

PNC FINANCIAL SERVICES GROUP INC;
PNC FINANCIAL SERVICES GROUP AND
AFFILIATES LONG TERM DISABILITY PLAN,
Appellants
_____

On Appeal from the United States District Court for the
Western District of Pennsylvania
(District Court No. 2-21-cv-00612)
District Judge:  Hon. Lisa P. Lenihan

_____

Argued on July 10, 2024
_____

Before: BIBAS, FREEMAN, RENDELL, *Circuit Judges*.

(Filed:  August 6, 2024)

Samuel M. Schwartz-Fenwick (Argued)
Julie M. Kamps
Seyfarth Shaw
233 S Wacker Drive
Suite 8000
Chicago, IL 60606

    For the Appellants

Michael D. Grabhorn (Argued)
Andrew M. Grabhorn
Grabhorn Law Office
2525 Nelson Miller Parkway
Suite 107
Louisville, KY 40223

      For the Appellee

_____

OPINION[*]

_____

**RENDELL**, *Circuit Judge*.

PNC Financial Services Group, Inc. and PNC Financial Services Group and Affiliates Long Term Disability Plan ("PNC") appeal from the District Court's grant of summary judgment in favor of Rhonda Hawks, an employee whose disability benefits were terminated by the plan administrator, Lincoln Financial Group ("Lincoln"), in November 2019. PNC urges that the District Court misapplied the applicable standard of review, failed to consider the language of PNC's Long Term Disability Plan (the "Plan") in assessing Hawks's ability to perform the duties of her occupation, and considered evidence that was never presented to Lincoln. We agree and will vacate and remand.

I

Rhonda Hawks was employed by PNC as a banking center manager. Hawks's job was summarized as follows:

> Manages priorities through planning and execution to drive all aspects of branch performance, including individual

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

expectations for outside business development. Builds a high performing team through the attraction, on-boarding, coaching and development of branch team members. Leads and impacts a broad range of eco-system partners in an omni channel environment. Drives revenue and loyalty through proactive interactions with clients.

App. 1526. Hawks was eligible for short-term disability and long-term disability ("LTD") benefits.

In April 2018, Hawks slipped and fell, fracturing her ankle, which required surgery, so she stopped working. She applied for, and received, benefits under the Plan, which was administered by Lincoln and funded by PNC's general assets. Under the Plan, for the first twenty-four months after LTD benefits begin, a participant is "disabled if [her] disability makes [her] unable to perform the material or essential duties of [her] own occupation as it is normally performed in the national economy." App. 111.

Over the course of the next year-and-a-half, Hawks was seen by her surgeon, Dr. Lewis, almost monthly, and her internist, Dr. Anderson. During this time, she had four surgeries, extensive physical therapy, and was consistently listed by multiple healthcare professionals as being severely limited in functional capacity and unable to perform her current job duties and experienced constant pain. She did show some signs of improvement in the Spring of 2019. *See*, *e.g.*, App. 1086–87 (describing scans showing her fractures had healed); App. 1152–54 (noting that Hawks reported subjective improvement). PNC was paying benefits to Hawks during this time.

In August 2019, Lincoln obtained a vocational analysis by vocational expert Michelle Reddinger. Reddinger reviewed PNC's five-page description of Hawks's role.

Reddinger also reviewed the training, education, and experience form submitted by Hawks; however, Hawks had left the fields identifying the tasks and duties of her position blank on the form. Reddinger then consulted the Dictionary of Occupational Titles ("DOT"), Occupational Information Network ("O*Net"), Occupational Outlook Handbook ("OOH"), and Economic Research Institute ("ERI") to determine what occupation in the national economy is most analogous to Hawks's own occupation. Reddinger concluded that Hawks's own occupation as normally performed in the national economy was substantially consistent with DOT occupation "Manager, Financial Institution" and O*Net occupation "Financial Managers, Branch or Department." App. 1081. Reddinger found that these two occupations are performed at the sedentary physical demand level in the national economy. App. 1081–82.

In November 2019, Dr. Lewis filled out Lincoln's Restriction Form and noted that Hawks had capacity to perform "activities as tolerated." App. 570–71. Unlike in prior Restriction Forms, Dr. Lewis did not identify any specific restrictions or limitations for Hawks. Dr. Lewis's evaluation notes documented improvement in Hawks's condition: Hawks "is ambulating in normal shoes. She is very pleased. She reports the sharp medial pain she had before surgery is gone." App. 567. He further reported that Hawks "looks quite good. She is very pleased with her current status/improvement." App. 568. Dr. Lewis noted that Hawks was "welcome to follow up with [him] as needed." App. 568. However, there is no evidence in the record that Hawks ever sought further treatment from Dr. Lewis.

4

That same month, Hawks's internist, Ian Anderson, also submitted a Restrictions Form. App. 629–30. Dr. Anderson checked a box indicating that Hawks had capacity for full-time sedentary work, with the only restriction being "unable to stand/walk any substantial length of time." App. 629–30. Dr. Anderson's office notes documented that Hawks's blood pressure was controlled, although her diabetes was not. In response to the form's inquiry about Hawks's inability to return to work, Dr. Anderson noted "Specialty follow-up. Unclear long term prognosis." App. 629. Hawks did not submit other treatment records from Dr. Anderson to Lincoln.

Lincoln then obtained an independent medical review of Hawks's medical records by Paul Stander, a board-certified internist. App. 587–89. Dr. Stander found, based on the treating physicians' notes, that Hawks had capacity for full-time sedentary work and that she was limited to standing/walking for brief periods and occasionally lifting, carrying, pushing, and pulling up to 10 pounds. App. 588. Dr. Stander did not himself examine Hawks. He also found it unnecessary to contact Dr. Anderson because "the documentation in the records and on the functional capacity form from [Dr. Anderson] is clear." App. 589.

In January 2020, Lincoln terminated Hawks's LTD benefits because it found that she no longer met the Plan's definition of disability. Lincoln specifically found Hawks had capacity to perform her own occupation as it is normally performed in the national economy within the restrictions noted by her treating physicians. Lincoln relied on the August 2019 occupational analysis in finding that Hawks's own occupation, as performed in the national economy, was sedentary. Lincoln also relied on Dr. Anderson's

November 2019 Restriction Form supporting Hawks's full-time sedentary work capacity and Dr. Lewis's November 2019 Restriction Form stating Hawks could perform activities as tolerated with no prescribed restrictions or limitations, with no follow-up visits scheduled.

In May 2020, Hawks appealed Lincoln's decision and provided additional medical records and opinions, including a June 2019 OAS Lifecare Plan prepared by Edmond Provder, a certified rehabilitation counselor and life planner. Provder concluded that Hawks's own occupation would be considered sedentary to light work because Hawks had spent most of her time standing and walking while at PNC. Provder later opined that her occupation should be considered light based on her job-specific duties. In this later opinion, he noted that he had reviewed an August 2020 evaluation by Dr. Anderson that set forth certain limitations including that Hawks could only work one third of the day. Lincoln also sought out and obtained additional vocational reviews by two different counselors, each of whom found the closest analogous occupation, "Manager, Financial Institution," to be sedentary work.

In November 2020, Lincoln upheld its decision that Hawks was no longer disabled as defined by the Plan. Lincoln's letter acknowledged that Hawks's SSDI claim had been approved and stated that Lincoln had fully considered the determination of the Social Security Administration (the "SSA") but noted that the SSA did not have the subsequent vocational and medical reviews that Lincoln had when it made its decision.

In January 2021, Hawks filed this lawsuit in the Western District of Kentucky. The parties stipulated to the case's transfer to the Western District of Pennsylvania based

6

on the Plan's forum selection clause. The parties filed cross-motions for summary judgment, and the District Court granted Hawks's motion and denied PNC's, finding PNC had abused its discretion in terminating LTD benefits. In September 2022, PNC filed a notice of appeal, docketed as C.A. No. 22-2814. In June 2023, we dismissed that appeal for lack of jurisdiction because the District Court had not entered a final order regarding pre-judgment interest.

In August 2023, the District Court awarded Hawks past-due benefits, pre-judgment interest at 6 percent, and attorneys' fees and costs. Hawks moved to amend the judgment to reflect that PNC had not reinstated her LTD benefits.

In September 2023, PNC filed a timely notice of appeal. After the District Court granted Hawks's motion to amend the judgment, PNC filed a supplemental notice of appeal.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). We have jurisdiction under 28 U.S.C. § 1291.

We review the District Court's summary judgment rulings *de novo*, *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011), and we apply the same standard of review that the District Court should have applied. *Est. of Schwing v. Lilly Health Plan*, 562 F.3d 522, 524 (3d Cir. 2009). When an ERISA policy delegates discretion to the plan administrator, expressly or implicitly, a court's review of the plan administrator's

7

decision is deferential.[1] *Viera*, 642 F.3d at 413. A court should be vigilant not to "substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits," *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008), and should overturn the denial of benefits only if it was arbitrary and capricious, meaning that it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."[2] *Miller v. Am. Airlines, Inc*., 632 F.3d 837, 844–45 (3d Cir. 2011).  An administrator's interpretation is not arbitrary if it is "reasonably consistent with unambiguous plan language."  *Bill Gray Enters. Emp. Health & Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001), *abrogated on other grounds by Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).

---

[1] Here, the Plan vests the administrator with:

> *full and complete discretionary authority to interpret the terms and provisions of the Plan and to resolve all questions under the Plan,* including without limitation, the authority to determine eligibility for benefits and the amount of such benefits; the right to make factual determinations; the right to determine whether any limitations, exclusions or other restrictions apply; and the right to resolve and remedy ambiguities, inconsistencies or omissions in the Plan in making such decisions.

App. 120 (emphasis added).

[2] For purposes of ERISA appeals, the arbitrary and capricious and abuse of discretion standards of review are essentially interchangeable.  *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010).

III

A

The District Court concluded that Lincoln's denial of benefits was arbitrary and capricious. In so finding, it opined that Lincoln,

> (a) failed to consider the requirements of [Hawks's] 'own occupation' as required under the Plan;
> (b) failed to give appropriate weight to the opinions of her treating physicians and/or reasonably explain facially-selective consideration of the treating physician records and opinions/assessments; and
> (c) elected to rely on purely paper reviews rather than obtain an Independent Medical Examination.

App. 9–10. PNC challenges these conclusions on appeal. We address each in turn.

(1) Failure to Consider the Demands of "Her Occupation"

The Plan defines "disability" by referencing the ability of the plan participant to perform the material or essential duties of "[her] own occupation as it is normally performed in the national economy." App. 111. Lincoln interpreted this definition to require Hawks to demonstrate that she was incapable of sedentary work—the level of work performed by a "Manager, Financial Institution" in the national economy. Hawks never urged Lincoln that her occupation as performed in the national economy was anything other than Manager, Financial Institution or Bank Manager. U.S. Dep't of Lab. Emp. & Training Admin., *Dictionary of Occupational Titles* 139–40.

The physical requirement for a Manager, Financial Institution or Bank Manager is sedentary. Such work "involves sitting most of the time, but may involve walking or standing for brief periods of time." *Id.* at 1013. A job is sedentary when "standing is

9

required less than or equal to 1/3 of the work schedule or workday." *Occupational Requirements Survey: Strength Levels*, U.S. Bureau of Lab. Stat., https://www.bls.gov/ors/factsheet/strength.htm (last visited July 22, 2024). Other physical requirements for sedentary work include exertions of up to 10 pounds of force to carry, push, or otherwise move objects on an occasional basis, defined as up to one-third of the day. *Dictionary of Occupational Titles, supra*, at 1013. Given that the disability definition expressly calls for a analysis of how the participant's job is "normally performed in the national economy," Lincoln did not act arbitrarily or capriciously in looking to the DOT to conclude that the benchmark for receiving benefits was whether Hawks could perform sedentary work.

The District Court disagreed, faulting Lincoln for not ruling based on how Hawks performed her own job and the level of physical effort it required. This, it said, was arbitrary and capricious. The District Court cites extensively to the opinion of *Van Arsdel v. Liberty Life Assurance Co. of Boston*, 267 F. Supp. 3d 538 (E.D. Pa. 2017) as support for its interpretation of the Plan language. *Van Arsdel* is instructive but does not support the District Court's determination.

There, the definition of "own occupation" was, as here, the job as performed "in the national economy." *Id.* at 572. The court there reinforced that reading and rejected the plaintiff's contention that his actual job description should be given greater weight than other information to determine how the job is performed in the national economy. *Id.* at 573. But the court did find that his job duties should inform the ultimate determination of what his occupation actually is. *Id.* at 574. There the court found that

10

the plan administrator abused its discretion in classifying the plaintiff's occupation as "controller" rather than "plant controller." *Id.* at 577. Similarly, in *Kavanay v. Liberty Life Assurance Co. of Boston*, 914 F. Supp. 2d 832 (S.D. Miss. 2012), the plan administrator ignored the tasks of the employee actually performed as an "Outside Claims Adjuster," concluding he could perform the sedentary occupation of an "Inside Claims Adjuster." *Id.* at 836. Here, Hawks never urged Lincoln that "Manager, Financial Institution" was not the appropriate classification nor that the duties of that occupation as normally performed are more strenuous than "sedentary."[3] On appeal, Hawks cites to our opinion in *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3d Cir. 2003), for support. However, the plan definition in that case made no reference to how the occupation was performed in the national economy so it is of little help. *Id.* at 387 n.5.

Thus, the District Court disagreed with Lincoln's reading of the Plan language, essentially ignoring the "in the national economy" language. Hawks does not urge that the Plan language is ambiguous, nor does the District Court. Both simply contend that Lincoln was wrong in confining its consideration to the duties as performed in the national economy, that is, sedentary. And although the District Court correctly described its standard of review as the "arbitrary and capricious" standard, App. 30, the District Court seemed to translate its disagreement into a finding that Lincoln's reasoning was

---

[3] For the first time on summary judgment, Hawks did present a vocational chart regarding other occupational categories and urged that the job was more demanding than sedentary. District Court CM/ECF No. 43 at 13. That was too little too late.

11

arbitrary and capricious. That was error because "mere lip service and mere citation to a standard of review will not suffice." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 125 (3d Cir. 2012) (emphasis omitted).

(2)     Failure to Consider All of the Evidence

Lincoln considered the latest reports of Dr. Lewis and Dr. Anderson, both of which could support a finding that Hawks was capable of performing sedentary work. It was Hawks's burden to adduce evidence that demonstrated that she was unable to perform sedentary work. This she was able to do as it related to her condition from April 2018, when she fell, through the summer of 2019 based on reports, and especially restrictions noted by Dr. Lewis over the course of those months. But in the autumn of 2019, Dr. Lewis noted her improvement and then-current nondisabling condition.

As noted above, Dr. Lewis, when describing Hawks's physical limitations, permitted performance of "activities as tolerated" and referred to his medical records. App. 570. Those records noted that Hawks was in "no apparent distress" and was "healthy appearing." App. 568. He noted that Hawks's "incisions [were] well healed" and that she "looks quite good. She is very pleased with her current status/improvement. She will continue activities as tolerated. She is welcome to follow up with me as needed."[4] *Id.* There is no evidence in the record that Hawks ever followed up with Dr.

---

[4] Contrast these notes with Dr. Lewis's earlier evaluations clearly indicating that Hawks had no capacity to return to her job. *See, e.g.*, App. 1541 ("All job functions restricted."); App. 1522 ("All job functions restricted and patient unable to drive for 4–6 weeks."); App. 1425 (checking box that states "Class 5 – Severe limitation of functional capacity, incapable of minimum activity"); App. 1443 ("Unable to perform current job duties."); App. 1412 (noting Hawks was to be "off work" with "[a]ll job functions restricted"); App.

12

Lewis after the November 2019 visit. And when Lincoln tried to follow up with the orthopedic surgeon to discuss Hawks's condition, he failed to respond to the administrator's inquiries.

Hawks's internist's restriction form from November 2019 also states that Hawks could perform sedentary work. Dr. Anderson agreed that Hawks could lift or carry up to 10 pounds occasionally, sit over 50% of the time and stand or walk occasionally. He noted separately that Hawks was "unable to stand/walk any substantial length of time." He also failed to respond to Lincoln's request for further information.

The District Court found that Lincoln engaged in "self-servingly selective use and interpretation of the medical records and fail[ed] to give appropriate weight to assessments and opinions of treating physicians, in particular Plaintiff's specialist orthopedic surgeon, Dr. Lewis." App 36. But the District Court does not refer to any statement of Dr. Lewis that would support that Hawks could not do sedentary work, other than his view that she would continue to have pain and stiffness. And the District Court attempted to minimize Dr. Anderson's checking the "sedentary" box in his November 2019 report by noting his "written statements to the contrary," App 38, particularly an August 2020 Physical Capacity Evaluation by Dr. Anderson referred to by Dr. Provder that purportedly said that Hawks could only work one third of a day. However, Dr. Anderson's evaluation was never submitted to Lincoln. "Under the ERISA record rule,

1285 ("Patient is off work until re-evaluation on 12/6/18."); App. 1261 ("Patient will be out of work for at least 3 months but could be up to 9 months pending healing."); App. 1040–41 ("Patient is off work until re-evaluation on 10/24/2019.").

13

judicial review of an ERISA fiduciary's discretionary adverse benefit decision is confined to the information contained in the administrative record." *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 271 (3d Cir. 2021) (emphasis omitted). The general ERISA record rule "prohibits supplementation of the administrative record with post hoc explanations for . . . benefit determinations." *Id.* There is no evidence of this evaluation anywhere in the administrative record, apart from a quotation about it in Provder's updated report. PNC notes that the internist's evaluation was not submitted to Lincoln during the administrative appeal but instead was attached as an exhibit to Hawks's summary judgment motion. Because Dr. Anderson's later evaluation was never included in the administrative record, we are barred now from considering it and Lincoln did not err in not crediting it. Thus, we do not agree with the District Court that Lincoln's assessment of the evidence was selective, let alone constituted an abuse of discretion. To the contrary, it was supported by substantial evidence.

### (3)    Failure to Order an IME

Hawks argues that Lincoln's failure to subject her to an IME should weigh in favor of finding that Lincoln's decision was arbitrary and capricious. We disagree.

The Plan placed the burden on Hawks to establish she was disabled as defined by the Plan, and the Plan had no obligation to adduce evidence to disprove her disability. Moreover, in Lincoln's view, the November 2019 treating physicians' notes showed Hawks was improving and was able to perform work at a sedentary level, so there was no need for an IME. Lincoln's decision to subject Hawks's records to multiple file reviews in lieu of an IME "does not render its denial of benefits arbitrary *per se*. However, it is

14

[a] factor to be considered in the overall assessment of its decision-making process."

*Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006). The Second Circuit convincingly stated that "as the four circuits that have addressed the question have concluded, where the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled."[5] Where Hawks's evidence did not establish disability, Lincoln did not abuse its discretion by electing not to order an IME.

While the District Court based its ruling primarily on the foregoing three aspects of Lincoln's determination, Hawks also asserts that Lincoln failed to address the SSA determination allowing benefits meaningfully and that its denial letters failed to comply with ERISA claims regulations. As to the latter, the denial letter was not "silent," as Hawks claims, regarding additional information that may be necessary to perfect her claim. To the contrary, the letter informed Hawks of her right to submit:

> Additional medical documentation such as treatment notes, test or therapy notes that were not previously submitted for review from any treating providers that was not previously submitted for review from January 2019 to the present; as well as any additional information which you feel will support your claim. You may request to review pertinent claim file documents on which the denial of benefits was based.

---

[5] *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 91 (2d Cir. 2009) (citing *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 325 (7th Cir. 2007); *Rutledge v. Liberty Life Assurance Co.*, 481 F.3d 655, 661 (8th Cir. 2007); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005); *Nicula v. First Unum Life Ins. Co.,* 23 F. App'x 805, 807 (9th Cir. 2001)).

App. 581–82; *see also* App. 162; *cf.* 29 C.F.R. § 2560.503-1. Thus, this argument lacks

merit.

Regarding the need to address the SSA determination, that argument, too, is

baseless. Hawks argues that Lincoln was required to explain its disagreement with the

SSA's decision that she was disabled for purposes of receiving SSDI. We find this

argument unpersuasive. The decision from the SSA was effective as of October 2018,

shortly after the accident and during the time that she was receiving benefits from PNC.

This was long before Lincoln had concluded that Hawks's recovery from multiple

surgeries made her able to perform her occupation. Additionally, while Lincoln's initial

claim determination letter was silent as to its disagreement with the SSA's determination,

Lincoln did provide an explanation in its appeal denial letter:

> In our review of this claim, Lincoln . . . did fully consider the
> [SSA's] ruling to approve [SSDI] benefits. It should be noted,
> however, that while we fully considered the [SSA's] ruling, the
> decision by the [SSA] does not determine entitlement to
> benefits under the terms and conditions of the [Plan].
> Moreover, Lincoln . . . has obtained and considered the
> vocational review and medical reviews by Dr. Stander, Dr.
> Broomes and Dr. Green that were not considered by the [SSA]
> in its determination process.

App. 241.

While the SSA determination of Hawks's "disability" is arguably relevant here,

the statutory definition is "not binding in the instant case." *Kunstenaar v. Conn. Gen.*

*Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir. 1990). And even where a plan administrator

completely fails to address an SSA finding of disability, when there is "substantial

16

evidence supporting [an administrator's] determination," such a failure does not render a denial of LTD benefits arbitrary and capricious. *Hobson*, 574 F.3d 75 at 92.

B

Under ERISA, a district court "in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g). In *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244 (2010), the Supreme Court construed this statutory provision to permit an award of fees and costs to any party that has achieved "some degree of success on the merits." Once that threshold has been met, district courts consider five factors[6] set forth in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983), to determine whether a court should grant attorneys' fees. The District Court here awarded attorneys' fees as a result of its consideration of the *Ursic* factors. Because we disagree with the District Court regarding Hawks's degree of success, a reevaluation of the *Ursic* factors is required, and we will vacate the award of fees and remand for further consideration consistent with our view of the merits.

IV

---

[6] These factors are as follows:

> (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deter[r]ent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position.

*Ursic*, 719 F.2d at 673.

17

For these reasons, we will vacate and remand for further proceedings consistent with this opinion.